UNITED STATES of America,
Appellee,

v.

Alfred Earl HARFLINGER, Appellant.

No. 20017.

United States Court of Appeals,
Eighth Circuit.

Dec. 31, 1970.

Rehearing Denied and Rehearing En Banc
Denied Jan. 18, 1971.

Thomas G. Hanlon, Tulsa, Okl., for appellant.

Calvin K. Hamilton, First Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before MEHAFFY, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The defendant Alfred Earl Harflinger was indicted and, in a jury trial, convicted on two counts of possessing a prohibited firearm, a bomb, in violation of 26 U.S.C. § 5861(c), and an unregistered firearm, a bomb, in violation of 26 U.S. C. § 5861(d).[1] A co-defendant, James William Nash, was also so charged and convicted but is now deceased. Harflinger received a sentence of 10 years on each count, the sentences to be served concurrently. On appeal Harflinger has filed two briefs, one by his court-appointed counsel and another pro se, raising a series of questions relating to arrest, search and seizure, grand jury notes, Fifth Amendment guarantees, and pretrial disclosure of names of government witnesses.

We have considered all the issues raised in both briefs but will discuss only those that are relevant and that have sufficient substance to merit discussion. Those issues not discussed are deemed to be without merit. We affirm the judgment of conviction.

A somewhat comprehensive recitation of the factual background of defendant's arrest and the search and seizure of the evidence supporting the charges is nec-

---

1. 26 U.S.C. § 5861 provides in pertinent part:

"It shall be unlawful for any person—

\*    \*    \*    \*    \*

"(c) to receive or possess a firearm made in violation of the provisions of this chapter; or

"(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record;"

Under § 5845(a) (8), the term "firearm" includes a "destructive device," defined under sub. (f) as including a bomb.

436 F.2d—59

essary to place in context the defendant's claims of error on this appeal.

Leslie Heriford, a liquid petroleum gas dealer living two and a half miles north of Ava, Missouri, had been warned to watch out for his equipment. On February 22, 1969, Heriford awoke about 4:30 a.m. with an upset stomach and, while seeking medicinal relief, noticed a car turned crossways in the road with its lights shining on his barn. The car backed up into the highway and drove slowly past his house. His carport light illuminated part of the highway and enabled him to determine that the automobile was a late model black over white Chevrolet. He was not able to see the persons in the car. He told his wife about the incident prior to leaving home early that morning. Mrs. Heriford left home about 6:40 a.m. and while proceeding to the Ava post office she met a late model black over white Chevrolet headed north, about a half mile from the Herifords' 18,000 gallon propane tank. She could see the driver of the car, whom she identified at trial as the defendant, but she could not see the passenger clearly enough to make an identification. As she passed the storage tank just prior to meeting the Chevrolet, she had noticed tire tracks made in the snow leading to the storage tank. When she reached the post office she called her husband to see if he had been around the tank that morning and told him about the tire tracks in the snow. Upon receiving this information, Heriford and a nephew, Marvin Lofton, drove to the bulk storage tank where they noticed that a car had been driven in, had stopped (apparently to let someone out), and then continued on the circular drive around the tank and back to the road. The person who alighted from that vehicle left distinctive bootprints in the snow made by a lugged sole. His tracks indicated that he walked up to the tank, circled it, then walked across the pasture and reentered the automobile.

Heriford and Lofton then drove to Ava in an attempt to locate the automobile which Heriford had observed earlier in his driveway. They spotted the car at Maples Cafe. Upon entering the cafe, Heriford saw two strangers seated at a table, one of whom was wearing boots with a lugged sole that appeared to be identical to the tracks Heriford observed near his storage tank. The individuals in question turned out to be the defendant Harflinger and his co-defendant Nash. Heriford then sent for the highway patrol in an attempt to find out why Harflinger and Nash had been around his storage tank. In the interval, Harflinger and Nash left the cafe and entered their automobile, a black over white Chevrolet bearing Missouri license plates.

Corporal Davis and Trooper Moore of the Missouri State Highway Patrol arrived at the cafe as the Chevrolet was leaving. Corporal Davis immediately made radio contact with his headquarters and requested a license check. He was advised that the license in question was issued to a Robert Brockman of St. Louis, Missouri, for a 1967 Chevrolet. Davis then had a conversation with Heriford, after which Davis and Moore proceeded to the square of Ava where they met the 1967 Chevrolet heading back toward the square. Davis turned the patrol car around and caught up with the Chevrolet as it started to enter the square. He immediately used his red light to stop the Chevrolet, which pulled to the curb on the east side of the square.

Davis parked the patrol car at the side of the Chevrolet and both Davis and Moore got out of the patrol car as the two occupants of the Chevrolet were emerging from their car. Davis asked Harflinger and Nash for their driver's licenses, which they produced, and asked what their business was in Ava. Harflinger replied he was looking for a friend named Art but did not provide any last name for Art. Nash said he was a heavy equipment operator seeking employment. Davis then inquired as to the owner of the 1967 Chevrolet and was told it belonged to a friend whose name they would not disclose. Harflinger and Nash did not produce registration papers for the automobile and did not furnish

information regarding the registered owner.[2]

Davis glanced into the Chevrolet and could see from his position outside of the car a claw hammer, large pliers and a butt end of a pool cue. On the front seat cushion he saw a roll of black friction electrical tape, two or three pairs of jersey cloth gloves and two or three road maps. One of the maps had the name "Leslie Heriford" written on it.

Davis then glanced into the interior of the automobile through the front door of the passenger side, which had been left open by Nash, and observed what appeared to be a chrome-plated handgun. After closing the car door, he moved Harflinger and Nash to the rear of the vehicles and told Trooper Moore to watch them. Davis then went to the driver's side, opened the door and looked beneath the seat; finding nothing on the driver's side, he reached over under the seat on the passenger's side and removed the chrome-plated handgun he had previously seen. It was a fully loaded .38 caliber revolver. Alongside of the revolver was a full clip of ammunition for a .45 caliber automatic.

Harflinger and Nash were then placed under arrest for having a concealed weapon, a violation of V.A.M.S. § 564.-610, and given *Miranda* warnings. Davis asked Harflinger to open the trunk of the Chevrolet. Harflinger did not say anything but responded by stepping forward and unlocking the trunk. After the trunk lid was raised Davis observed a cardboard box in the trunk. Inside the box were ten sticks of dynamite, a length of slow fuse, an electric blasting cap with several feet of lead wire, an alarm clock and a 6-volt battery. The clock was ticking and Davis, thinking the device might be dangerous,

pulled the wires loose from the clock. This homemade destructive device or bomb was so constructed that it could be set and made fully operative by placing one of the taped lead wires in the top of the alarm clock near a small hole which had been drilled in the face of the clock. It would thus be a time bomb which could be detonated as desired within the space of an hour. After disarming the bomb, Davis asked Harflinger and Nash if they knew anything about the bomb and they both stated they knew nothing about it or how it got into the trunk. The evidence adduced at the trial, however, showed that the fabric of five of the six gloves Davis took from the Chevrolet contained particles which were similar to particles of the dynamite found in the trunk of the Chevrolet. Likewise, similar particles were found on the shirts and trousers of Harflinger and Nash. In addition, the cut on the end of the roll of friction tape found on the front seat of the Chevrolet exactly matched the cut on one end of the tape used to tape the wire to the alarm clock.

Harflinger and Nash were then handcuffed and taken to the jail, which was less than a block from where the arrest occurred. Davis asked Lofton, who had arrived at the scene by this time, to drive the Chevrolet to the jail while Davis followed. Lofton parked the Chevrolet at the jail, locked it, and gave the keys to Davis, who then went inside the jail to assist in fingerprinting and booking Harflinger and Nash. After the booking Davis returned to the Chevrolet, unlocked the trunk and removed the bomb. This search also revealed a .30–30 Marlin rifle in the trunk and a fully loaded .45 caliber pistol under the dash. The ash tray contained ammunition for the rifle and the .45 automatic pistol.[3]

---

2. Although proper driver's licenses were produced, the information given about the ownership of the car was evasive and unsatisfactory in light of the fact that the motor vehicle was licensed to someone other than the two occupants and gave rise to probable cause for their arrest for automobile theft. Sewell v. United States, 406 F.2d 1289, 1292 (8th Cir. 1969).

3. The two handguns, the rifle and the ammunition were not received into evidence. The .38 caliber revolver and the ammunition in it were admitted into evidence but were later withdrawn.

The next day Davis found a 1964 Chevrolet II parked in Ava which was registered to Nash. A subsequent check verified that the destructive device found in the 1967 Chevrolet was not registered in the National Firearms Registration and Transfer Record to Harflinger, Nash or anyone else.

Harflinger filed a pretrial motion to suppress the evidence obtained in the search of the 1967 Chevrolet claiming an unconstitutional arrest, search and seizure of the bomb and other incriminating evidence obtained in that search. He also contends that the original warrantless stopping of Nash and him was unlawful and that, if there were probable cause for the arrest, the act of causing the trunk to be opened (thereby revealing the bomb) constituted an unlawful search. The trial court overruled the motion.

## THE INVESTIGATIVE STOP, AR-REST, SEARCH AND SEIZURE

■ Initially, Harflinger argues his arrest occurred when he complied with Corporal Davis' signal to stop (the flashing red light); he equated this investigative stop to an arrest under Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). We disagree. Harflinger was not arrested at that time but was merely stopped for investigative purposes.

The brief detention of a citizen based upon an officer's reasonable suspicion that criminal activity may be afoot is permissible for the purpose of limited inquiry in the course of a routine investigation, and any incriminating evidence which comes to that officer's attention during this period of detention may become a reasonable basis for effecting a valid arrest. As explicated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968), there is a difference between a limited detention or seizure of a person and an arrest. *See also* Rodgers v. United States, 362 F.2d 358, 362 (8th Cir.), cert. denied, 385 U.S. 993, 87 S.Ct. 608, 17 L.Ed.2d 454 (1966) ("a routine license check and its concomitant

temporary delay of a driver * * * do not constitute an arrest in the legal sense"). Any intrusion upon a person's liberty or search of his person, car or other area in which he is located must be limited and confined to the circumstances and exigencies of the matter or conduct under investigation to comply with the Fourth Amendment's guarantee against "unreasonable searches and seizures." In making an assessment of the stopping and limited detention in the instant case, the facts are to be judged against an objective standard of reasonableness: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry v. Ohio, 392 U.S. at 21–22, 88 S.Ct. at 1880. In Carpenter v. Sigler, 419 F.2d 169, 171 (8th Cir. 1969), in an opinion written by Chief Judge Van Oosterhout, this Court observed that the judicial inquiry into the question of reasonableness under Terry v. Ohio is a dual one:

"(1) whether the facts warranted the intrusion on the individual's Fourth Amendment rights, and (2) whether the scope of the intrusion was reasonably related 'to the circumstances which justified the interference in the first place.'" (footnote omitted.)

We are convinced that both the stop and the limited inquiry which followed were reasonable under the circumstances and met the test of *Terry*. In balancing the government's need to stop a person against the invasion of personal liberty and privacy which such a seizure entails, we think the need to detain for limited inquiry clearly outweighed Harflinger's interest in freedom of action. Terry v. Ohio, *supra;* *see also* Camara v. Municipal Court, 387 U.S. 523, 87 S. Ct. 1727, 18 L.Ed.2d 930 (1967). Corporal Davis had previously talked to Leslie Hariford about Harflinger's and Nash's suspicious conduct and had caused a license check be made on the car they were driving. With this information Davis had the right to inquire of Harflinger about his activities and to make

a limited detention of Harflinger for that purpose.

We believe police officers have a duty, as well as the right, to investigate complaints from apprehensive potential victims. Even though a crime had not been committed prior to the investigative stop and might never be committed, the stop and the ensuing limited detention for investigative inquiry must be permitted when officers reasonably suspect that criminal activity may be afoot if the police are to carry out their legitimate functions of crime prevention and detection. United States v. Unverzagt, 424 F.2d 396 (8th Cir. 1970); Carpenter v. Sigler, *supra*; Dupree v. United States, 380 F.2d 233 (8th Cir. 1967), cert. denied, 392 U.S. 944, 88 S.Ct. 2289, 20 L.Ed.2d 1407 (1968); Jackson v. United States, 408 F.2d 1165 (8th Cir.) cert. denied, 396 U.S. 862, 90 S.Ct. 135, 24 L.Ed.2d 114 (1969); United States v. Lewis, 362 F.2d 759 (2d Cir. 1966); United States v. Self, 410 F.2d 984 (10th Cir. 1969); United States v. Williams, 416 F.2d 4 (5th Cir. 1969), cert. denied 397 U.S. 968, 90 S.Ct. 1008, 25 L.Ed.2d 262 (1970); United States v. Thompson, 420 F.2d 536 (3d Cir. 1970).

■ Harflinger attempts to make much out of Corporal Davis' testimony at the state court hearing on a motion to suppress that he followed a practice of stopping out-of-state automobiles. We cannot condone such a patently unconstitutional intrusion upon the rights of any citizen, but here there was a reasonable basis for stopping Harflinger and Nash. The stop was not made on the basis of an out-of-state license plate or by the fact that they were strangers in the community. Reasonable suspicion for an investigative stop, like probable cause for an arrest, is determined by objective facts. Terry v. Ohio, 392 U.S. at 22, 88 S.Ct. 1868; Klingler v. United States, 409 F.2d 299, 304 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); United States v. Skinner, 412 F.2d 98, 102 (8th Cir.), cert. denied, 396 U.S. 967, 90 S.Ct. 448, 24 L.Ed.2d 433 (1969).

■ Harflinger, in his pro se brief, contends that he did not voluntarily get out of the car when he was stopped but was ordered to do so by Trooper Moore and views this action of the officer as an arrest. We do not think the scope of the intrusion is so significantly enhanced by requiring a suspect to get out of his car to answer questions that the investigative stop can then be equated to an arrest. In addition to upholding the police officer's right to stop a suspect based on a reasonable suspicion less than probable cause, Terry v. Ohio also recognized there is a very valid governmental interest in allowing police officers to take limited steps to assure themselves that the person with whom they are dealing is not armed, including a limited search of the suspect for weapons. We are cognizant that *Terry* approves such protective searches of a suspect only "where nothing in the initial stages of the encounter [investigative stop] serves to dispel his reasonable fear for his own or others' safety." 392 U.S. at 30, 88 S.Ct. at 1884. Nonetheless, we think it within the reasonable scope of an investigative stop to order the suspect out of the car to answer questions. This not only enables the officer to better judge the suspect's demeanor and hear his answers, but also fosters the recognized self-protection interest in that the officer can fully observe the suspect and the suspect is removed from any readily available weapon that might be in the car. *See* Carpenter v. Sigler, 419 F.2d at 172.

## THE SEIZURE OF THE BOMB

■ It is a recognized principle that, assuming the existence of probable cause to arrest, automobiles and other vehicles may be searched without warrants as incident to the arrest " 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543, see Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879." Chimel

v. California, 395 U.S. 752, 764 n. 9, 89 S.Ct. 2034, 2040–2041, 23 L.Ed.2d 685 (1969). As we discussed in footnote 2, the officers' reasonable suspicions developed into probable cause to arrest for auto theft during the questioning of the suspects. Furthermore, prior to searching the car, Officer Davis observed a .38 caliber revolver which was partially hidden under the seat on the passenger's side. Consequently, the officers not only had probable cause to arrest the suspects for carrying a concealed weapon, but they also had probable cause to search the car for other weapons.

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). "[T]hings which are visible and accessible and in the offender's immediate custody can be seized by the police * * *." United States v. Baca, 417 F. 2d 103, 105 (10th Cir. 1969). Here, the pistol was in plain sight and was observed by one arresting officer prior to the arrest from a vantage point where the officer had a right to be. Since the gun was properly observed, the observation was not a search and supplied the basis for probable cause to arrest the suspects and probable cause to search the car for other weapons. Carpenter v. Sigler, 419 F.2d at 172; Theriault v. United States, 401 F.2d 79, 83 (8th Cir. 1968), cert. denied, 393 U.S. 1100, 89 S.Ct. 898, 21 L.Ed.2d 792 (1969); United States v. Briddle, 436 F.2d 4, at 8 (8th Cir. 1970); United States v. Holgerson, 424 F.2d 1130 (10th Cir. 1970).

After seizing the .38 revolver, Officer Davis placed Harflinger and Nash under arrest and gave them the *Miranda* warnings. Davis then asked Harflinger if he would open the trunk of the car, which Harflinger did. Inside a cardboard box in the trunk Davis found the time bomb.

After Davis observed the concealed weapon inside the suspect's car, there was clearly probable cause to believe that the car contained other weapons, articles which the officers were obviously entitled to seize. In Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970), the Supreme Court reaffirmed the principle of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925):

> "*Carroll, supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." 399 U.S. at 51, 90 S.Ct. at 1981.

The search of the trunk was made immediately after the arrest, the bomb was discovered and disarmed, and, although the bomb itself was not physically seized, the car was seized, including its contents. Even should we assume that the bomb was not seized until it was actually removed from the trunk of the car at the jail, probable cause to search clearly still obtained at the jail and so did the mobility of the car. The warrantless search of the car and the seizure of the bomb in its trunk were clearly permissible under Chambers v. Maroney.

In addition, since we conclude that the search of the trunk and seizure of the bomb were contemporaneous with the arrests of the suspects and were made at the place of arrest, the search which produced the incriminating evidence was also justified as a search incident to a lawful arrest. Nothing said in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), is antithetical to this conclusion as probable cause existed for the search and the search was not too remote in time and place.

We do not think the fact that Corporal Davis waited a few minutes until the suspects were confined before taking physical possession of the bomb invali-

dated the search and seizure. To have removed the bomb at the time and place of arrest would have been dangerous to the safety of Davis and others at the scene of the arrest. To have allowed the car to remain parked at the curb or to have allowed the bomb to remain in the trunk of the car after it was parked at the jail, while the officers obtained a search warrant, would have been reckless conduct indeed, for it was quite conceivable that the bomb might explode if the car received an unusual jolt or shock.

Defendant's contention that he did not voluntarily open the trunk is immaterial. This Court made clear in Gullett v. United States, 387 F.2d 307, 311–312 (8th Cir. 1967), cert. denied, 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed. 2d 307 (1968), that the search of the trunk of a car is within the permissible scope of a warrantless search incident to a lawful arrest.

## DISCLOSURE OF MATTERS OCCURRING BEFORE GRAND JURY

Harflinger filed a pleading entitled a pretrial motion for "Disclosure of Matters Occurring Before the Grand Jury," alleging that the transcript was necessary to impeach any witness testifying against him and to determine whether matters occurring before the grand jury provided grounds for a motion to dismiss the indictment.

The trial court denied the motion for lack of good cause but without prejudice to renewing the motion during the trial.

Harflinger contends that the motion was denied because there was no transcript of any testimony of the witnesses who appeared before the grand jury. He further maintains that he has been denied due process in that the United States District Attorney deliberately failed to have recorded the grand jury witnesses' testimony in order to defeat the granting of any motion of Harflinger to produce testimony taken before the grand jury and that these tactics of the Government are fatally defective to the validity of the indictment.

The Government did not base its opposition to Harflinger's motion on the fact that the grand jury testimony was not available. The testimony was recorded and transcribed and would have been available for inspection upon an order of the court, during the trial, if "particularized need" had been shown by the defendant. The Government correctly points out that grand jury testimony is ordinarily not discoverable on a pretrial motion, but it is discoverable after a witness has testified at the trial if the defendant shows a particularized need. We have exhaustively considered these same issues in our recent opinion in Hanger v. United States, 398 F.2d 91, 95–98 (8th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969), and defendant has failed to set forth any arguments which require us to elaborate on our views. *See also* United States v. Davis, 410 F. 2d 959, 961 (8th Cir. 1969); Stewart v. United States, 395 F.2d 484, 492 (8th Cir. 1968). Furthermore, Harflinger did not renew his request for the transcript of the grand jury testimony of any witness during or after the direct examination of the witness; consequently, no timely request has been made by him. Hanger v. United States, 398 F.2d at 97–98; United States v. Davis, 410 F.2d at 961. While the grounds stated by Harflinger in his motion may have been sufficient to establish a particularized need for production of the grand jury minutes had that motion been renewed during or after the direct examination of the witness(es), we do not think that Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), commands the disclosure of a witness' grand jury testimony prior to the time of his testimony at trial.

While there is nothing in the record which supports Harflinger's contention that the grand jury testimony was not recorded, neither statute nor the Constitution requires that the testimony of witnesses before a grand jury

be recorded or transcribed. As this Court stated in United States v. Franklin, 429 F.2d 274, 276 (8th Cir. 1970): "We know of no case which holds that the failure to record and transcribe testimony given before a grand jury is ground for dismissal of any indictment returned." *See also* United States v. Watson, 421 F.2d 1357, 1358 (9th Cir. 1970). Recordation of grand jury proceedings is of fairly recent origin. At common law and at the time of the adoption of our Constitution, legal proceedings and grand jury proceedings were not recorded. We find no constitutional right to have grand jury proceedings recorded. The trial court properly denied Harflinger's pretrial motion to inspect the grand jury minutes.

## DISCLOSURE OF GOVERNMENT WITNESSES PRIOR TO TRIAL

█ We find no merit in the defendant's contention that the Government should disclose the names of its witnesses on a pretrial motion. Under 18 U.S.C. § 3432 the witnesses in a capital offense case must be disclosed at least three days prior to trial, but there is no rule or cases holding that the Government in a non-capital case must divulge the names of its witnesses in advance of trial. A denial of a motion seeking to compel disclosure is certainly within the discretionary authority of the trial court. Dean v. United States, 265 F.2d 544, 547 (8th Cir. 1959); Ray v. United States, 367 F.2d 258, 263 n.5 (8th Cir. 1966), cert. denied, 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967); United States v. Glass, 421 F.2d 832, 833 (9th Cir. 1969).

## FIFTH AMENDMENT CONTENTION RELATING TO 26 U.S.C. §§ 5861 (c) AND (d)

█ Harflinger in another pretrial motion sought to dismiss counts I and II of the indictment against him on the grounds that his Fifth Amendment privilege against self-incrimination constituted a complete defense to these counts. He relies on James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the trilogy of Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), United States v. Covington, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969), and Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

Count I charged Harflinger with knowingly possessing a firearm (the bomb) which had been made in violation of 26 U.S.C. § 5822, and Count II charged him with possessing a firearm which had not been registered to him in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841.

These counts were brought under the National Firearms Act, 26 U.S.C. Chapter 53, as amended by the Gun Control Act of 1968. 82 Stat. 1227 et seq. The amendments of course were enacted to overcome the adverse effect of *Haynes* on gun control legislation. Harflinger was not charged under 26 U.S.C. § 5861 (f) as the maker of a firearm but rather was charged in count I as the possessor of an unlawfully made firearm. The requirements imposed under 26 U.S.C. § 5821 (paying the tax on making a firearm), 26 U.S.C. § 5822 (filing a written application to make and register a firearm), and 26 U.S.C. § 5841 (registering a firearm) all fall on the manufacturer or maker and are imposed upon the manufacturer or maker before he makes the firearm.[4] There are no requirements im-

---

4. Harflinger did not claim to be the maker of the firearm and the evidence does not show him to be the maker of a firearm. Harflinger, therefore, cannot claim any privilege of self-incrimination which might possibly be claimed by the maker. Reed v. United States, 401 F.2d 756, 762–763 (8th Cir. 1968), cert. denied, 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48 (1969).

posed on the possessor of an unlawfully made firearm.

We conclude that § 5861(c) does not violate Harflinger's privilege against self-incrimination guaranteed by the Fifth Amendment. Even under the old act (prior to the 1968 amendments), the charge of possessing an illegally made firearm was not subject to the *Haynes* defense. Reed v. United States, 401 F. 2d 756, 762–763 (8th Cir. 1968), cert. denied, 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48 (1969); DePugh v. United States, 401 F.2d 346, 351–352 (8th Cir. (1968); Lewis v. United States, 408 F.2d 1310, 1312 (10th Cir. 1969); Marshall v. United States, 422 F.2d 185, 193–198 (5th Cir. 1970). Under the amended act, the possession of an illegally made firearm is illegal and cannot be validated once the illegality attaches to the firearm. Judge Matthes's reasoning in Reed v. United States is equally applicable to the amended act and the instant case:

> "We do not believe the Supreme Court intended that its holding in *Haynes* should be applied to a situation where, as here, the defendant was under no statutory command to and did not in fact supply any self-incriminating information." 401 F.2d at 763.

Count II of the indictment charged Harflinger with possessing a firearm which had not been registered to him as provided in 26 U.S.C. § 5841. The Gun Control Act of 1968 provided an amnesty period between November 2 and December 1, 1968, for the possessor of an unregistered firearm. During this period, the possessor could register the firearm without incrimination. Section 207(b) of the Gun Control Act of 1968; Public Law 90–618; 82 Stat. 1235. After the amnesty period there are no provisions in the act requiring a current possessor of an unregistered firearm to register. Under the amended act, the duty to register, except for possessors during the 1968 amnesty period, rests with the importer, manufacturer or maker and not

on the transferee, although the firearm is registered to the transferee. Consequently, the statutory scheme of the amended National Firearms Act provides a method by which a person under certain circumstances can secure lawful possession of a firearm, in contrast to the old act which sought to compel disclosure of an unlawful possession. Furthermore, the new act does not require the possessor to furnish information to the government concerning unregistered firearms, although possession of an unregistered firearm is unlawful of course under 26 U.S.C. § 5861(d).

The amended act also provides safeguards against self-incrimination by limiting the approval of transfers or "making applications" to those instances where transfer, receipt, possession, or making would not place the maker or transferee in violation of the law. 26 U.S.C. §§ 5812 and 5822. The amended act further provides that information or evidence obtained from a person attempting to comply with the provisions of the act shall not be used against a person in a criminal proceeding except in the case of perjury. 26 U.S.C. § 5848.

In United States v. Valentine, 427 F.2d 1344 (8th Cir. 1970), this Court upheld the validity of 26 U.S.C. § 5861 (d) against a challenge that it violated the defendant's Fifth Amendment privilege against self-incrimination. We are in complete agreement with Judge Lay's reasoning in *Valentine:*

> "Under the new Act, there is no obligation upon the possessor to register or furnish information to anyone. Thus, violation of the new Act occurs when a person elects to take possession of a firearm that is contraband inasmuch as it is not registered. In addition, under the amended Act, *all* 'firearms' must now be registered by the transferor rather than those which are unlawfully obtained. Under these circumstances, under the new Act there exists no compulsion to incrim-

inate oneself." 427 F.2d at 1346–1347 (footnote omitted).

*See also* United States v. Campbell, 427 F.2d 892 (5th Cir. 1970).

Any attempted compliance with the statutory requirements with respect to either count of the indictment could not have resulted in Harflinger's compulsory self-incrimination. Had an application been made to make the firearm, it would have been disapproved if the making or possession of the firearm would have placed the person making the firearm in violation of the law. 26 U.S.C. § 5822. Likewise, § 5812 requires that an application to transfer a firearm "be denied if the transfer, receipt or possession of the firearm would place the transferee in violation of law." There is thus no exposure to either state or federal prosecution for compliance with the provisions of the amended National Firearms Act challenged by Harflinger. The incriminating situations occurring under the trilogy of *Haynes, Marchetti* and *Grosso* cannot occur under the amended act.

We find that Harflinger's Fifth Amendment rights against self-incrimination have not been violated and the trial court properly overruled a motion to dismiss counts I and II of the indictment.

The defendant has vigorously contested this proceeding every step of the way by numerous pretrial motions raising any presently conceivable constitutional or legal issue, which he has the full right to do. He however has been accorded a full and fair trial and the evidence adduced strongly supports the judgment of conviction. We find no violation of any of his constitutional or legal rights and any other issues raised in his two briefs and not discussed herein are found to be without any merit.

Judgment affirmed.