STATE of Missouri,
Plaintiff–Respondent,

v.

Crayton D. WEST,
Defendant–Appellant.

No. 53261.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 14, 1989.

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Karen A. King, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KAROHL, Presiding Judge.

Crayton West was convicted of seven counts of robbery in the first degree, in violation of Section 569.020 [1] and sentenced

---

**1.** Unless otherwise indicated, all references to statutes are to RSMo 1986, and all references to Rules are to Missouri Rules of Court, V.A.M.R.

as a prior offender under Section 558.019, to thirty years in the Department of Corrections and Human Resources on each count. The first three sentences run concurrently to each other, and the last four sentences run concurrently to each other beginning when the first three sentences expire. The seven sentences total sixty years. West appeals the trial court's decision on five grounds. We affirm the convictions. We remand for re-sentencing.

West claims that the trial court erred in: (1) denying his motion to suppress evidence, statements, and identifications, because the evidence was obtained as a result of an illegal stop and seizure; (2) overruling his objection to Officer Rose's testimony on the grounds that the state didn't adequately lay a foundation for the officer to give testimony based on his firsthand knowledge; (3) overruling his motion for a mistrial after the prosecutor announced in front of the jury his intention to return money seized from West to Zantigo's restaurant, one of the victims; (4) overruling his challenge to the state's use of peremptory strikes; and, (5) retroactively relying on Section 558.019, forbidding West from applying for parole until forty percent of this sentence has been served, and rendering Section 558.019 an ex post facto law.

The seven robbery convictions share the following facts: (1) a large, black man entered a fast-food restaurant; (2) he ordered food; (3) when tendering money for his order the man used a small black gun to aid him in grabbing the money from an open cash register. The seven robberies occurred between October 8–18, 1986.

In his first point on appeal, West claims that the trial court abused its discretion by admitting evidence, statements and identifications obtained as a result of an illegal stop and seizure. West claims that the police stopped him because he was a large black man in a Buick, not because they observed suspicious behavior on his part. We find that the trial court did not abuse its discretion in overruling Wests' motion

to suppress evidence, statements and identifications.

Police radio dispatches and police station announcements related to the crimes for which defendant was charged spoke of a "fast-food robber." They described the robber as a black man with a large build. For two weeks before the stop police circulated a composite photo among the officers and broadcast the description of a black male, thirty-five years old, six-feet-four inches tall, and two hundred seventy-five pounds, muscular build, wearing a red baseball hat and tinted wire-rim glasses. The first radio call on the evening of the final robbery and stop described a six-foot black male, possibly wearing a green jacket.

The last of the seven robberies occurred at Zantigos' restaurant, October 18, 1986. A female Zantigo employee followed the robber after his departure from the restaurant. She saw him walk up a street. She heard a car door shut, an engine start, and saw a car pull out from the curb to the street. When the police arrived she told them: 1) she saw a dark blue, four-door car, possibly an Impala; 2) she saw the car drive two blocks north and turn right onto Fairview towards Grand; and, 3) the robber used a small handgun to aid him in robbing the restaurant.

Shortly thereafter, officers Burford and Laschober were southbound on Grand Avenue when they learned these facts via their radio. They began watching northbound traffic. They spotted a light gray over dark gray Buick Electra proceeding north. They saw that the driver was a large black man. The officers followed him in their patrol car.

The police officers stopped West[2] and ordered him out of the car. In a pat down search Officer Burford felt a hard object in West's right front coat pocket. The police officer reached in and retrieved a small dark handgun. Officer Burford testified he placed West under arrest after discovering the gun. Officer Burford continued

---

**2.** Officer Burford testified at trial that West was driving above the speed limit. However, the police officers did not issue a speeding ticket.

the search and discovered a wad of paper currency in West's pants. Officer Burford placed handcuffs on West, repeated that he was under arrest and read him his rights.

Fellow police officers brought four witnesses from Zantigo's. One witness viewed West but stated she could not identify him as the robber because the assailant wore a hat and sunglasses. Officer Laschober went to West's car and saw, in plain view, a hat and sunglasses. The witness instantly recognized West as the man who robbed the restaurant after Officer Laschober placed the hat and sunglasses on West.

At a lineup later that evening, employees from other fast food restaurants recently robbed identified West as the man who robbed the establishments where they worked. The trial court overruled objections to this evidence.

The standard for a reasonable stop and search was established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, a police officer observed two men continually peer into a store, pace to the corner, confer with a third man then repeat the activities for approximately ten to fifteen minutes. The police officer's suspicions were thoroughly aroused so he approached the three men, identified himself and requested their names. After the men mumbled incoherent responses to his questions, he patted down the outside clothing of one of the men and discovered a pistol. He also found a revolver in the outer pocket of the second man who he patted down. The police officer testified that he did not put his hands under the garments of the men until he discovered the weapons. The court held that the police officer's actions constituted a legitimate stop.

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigation behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. *Id.* at 31–31, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911.

Support of significant governmental interests underlies the holding in *Terry*. First, there is a strong governmental interest in "solving crimes and bringing offenders to justice." *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Prohibiting state involvement where probable cause is absent would hinder the investigatory police process and possibly permit the suspect to escape. *Id.* at 229, 105 S.Ct. at 680, 83 L.Ed.2d at 612. Where there is a threat to public safety it is particularly important that the suspect be detained as quickly as possible. *Id.*

Second, there is a strong governmental interest to allow police officers to assure themselves that the suspect with whom they are dealing is not armed. *United States v. Harflinger*, 436 F.2d 928 (8th Cir.1970). In *United States v. Harflinger* the court recognized that *Terry* condoned a protective search only where the initial steps of the investigative stop did not quell the police officers' fears for his own or others' safety. *Id.* at 933. The court in *Harflinger* stated that the police officers' request that the suspect get out of the car to answer questions was within the scope of the investigation because it allowed the police officer to observe the suspect's demeanor and to watch the actions of the suspect for any suspicious behavior. *Id.*

To uphold the policies underlying the *Terry* standard it is necessary to meet two tests. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, *Terry* requires that the stop be legally proper when it is instigated. *State v. Fernandez*, 691 S.W.2d 267, 269 (Mo. banc 1985). "If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved or is wanted in a completed felony, then a *Terry*

stop may be made to investigate that suspicion." *Id.* (quoting *Hensley,* 105 S.Ct. at 681). Police had the requisite suspicion to make a legitimate *Terry* stop in *State v. Adell,* 716 S.W.2d 469 (Mo.App.1986).

In *Adell,* Officer Lane heard a radio dispatch that black males had been firing gunshots at each other. She went to the location announced in the dispatch and saw two black males walking from the vicinity of the shooting. She approached the men and asked for identification. Because the suspects met the description and came from the vicinity of the shooting, Officer Lane "had a reasonable suspicion that criminal activity may be afoot." *State v. Lasley,* 583 S.W.2d 511, 518 (Mo. banc 1979). In *Adell,* the court held that the police made a justifiable stop because the police had the requisite suspicion though there was no probable cause to arrest. *State v. Adell,* 716 S.W.2d at 471.

■ In the instant case, police officers Burford and Laschober made a legitimate *Terry* stop of West based on the objective facts they knew. First, circulars and announcements heard in the police station for two weeks prior to the arrest described the robber as a large black man. Second, the radio dispatch on the night of the Zantigo's robbery stated: 1) the address of the robbery: 2) the direction in which the robber was driving; and, 3) the description of the assailant as a heavy black male. Seeing a car approach from the direction of Zantigo's restaurant, driven by a large black male, the police officers suspicions were justifiably aroused. They proceeded to stop West and requested that he get out of the car. The police officers' stop of West was legitimate under the guidelines established in *Terry* because of the combination of facts before them.

■ Second, *Terry* requires that the scope of the investigatory search be reasonably related to the situation that warranted the stop. *State v. Fernandez,* 691 S.W.2d 267, 269 (Mo. banc 1985). In determining the permissible scope of intrusions we must balance the need to identify criminals with the need to protect police officers and the public from the invasion of individual rights, considering the circumstances of the intrusion. *Fernandez,* 691 S.W.2d at 269–70. The court in *State v. Johnson,* 702 S.W.2d 65 (Mo. banc 1985) held that the scope of the police officers' search of a suspect was proper based on the facts known to them. *Johnson,* 702 S.W.2d at 72.

In *Johnson,* patrolling police were notified that the seventh rape occurred in a string of rape incidents all located at the same site. The description dispatched to the police matched that given by the prior victims: "Black male, late 20's to 40 years of age, five-feet-eight inches to six-feet in height, approximately 160 pounds, ... wears a baseball cap on which appears a logo and carries a silver-handled pocket knife with rusted blades." *Id.* at 67. Police officers saw a man fitting the above description standing where the seven rapes occurred. The officers approached the suspect and immediately performed a patdown frisk of the person. The court stated the search was proper "in light of the fact that the officers had been told that the rapist was armed with a knife." *Id.* at 72.

Just so, in the instant case officers Burford and Laschober suspected that the assailant may be armed, therefore, the scope of their search was reasonably related to the situation that warranted the stop. The police dispatch informed the officers that the Zantigo restaurant was robbed at gunpoint. The officers knew that the previous six robberies had been committed with the aid of a small handgun. Their background knowledge and the radio announcement gave the officers reason to suspect that the assailant was armed. *See, Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

■ The seizure of the gun was also proper police conduct in light of the justification for the search: to protect themselves and the public. Officer Burford restricted his search to what was minimally necessary to discover whether West was armed. *Terry,* 392 U.S. at 26, 88 S.Ct. at 1882, 20 L.Ed.2d at 908–09. He patted down only the outer clothing of West. The officer did not search under West's cloth-

ing until he found the handgun. We conclude that the handgun taken from West was properly seized and therefore, properly admitted into evidence against West.

■ Finally, we find the police had probable cause to arrest West. First, the police found a concealed weapon in violation of Section 571.030.1(1). Further investigation by the police of West's person and his car produced additional evidence of probable cause to arrest West. The police officers found a wad of paper currency hidden in West's pants. The police also saw, in plain view, a hat and sunglasses on the front seat of West's car. A witness from Zantigos' testified that the robber donned a hat and sunglasses. The discovery of: 1) the money in Wests' pants; 2) the hat and the sunglasses in his car; and, the officers' knowledge of the possible use of the items in the Zantigo robbery, gave the police officers probable cause to arrest West. West's first point on appeal is denied.

■ We deny West's second point on appeal and find that the trial court properly overruled West's objection to the testimony of Officer Rose. Officer Rose testified that the police apprehended a different fast-food restaurant robber and that the case was closed. West objected on the grounds that the state failed to lay a proper foundation for Officer Rose to give testimony based on his firsthand knowledge of the disposition of the other cases. The appeal challenges a collateral point, one wholly irrelevant to the guilt or innocent decision of the jury. The radically different description of the robber who committed the other robberies suggests the evidence was not prejudicial.

During trial the jury learned that the police suspected another individual of robberies at fast-food restaurants in the St. Louis area. The case involved a robber characterized as the "Bantam Bandit" due to his diminutive stature. Officer Rose testified that he had worked on the Bantam Bandit investigation and had written one report for the investigation. On redirect examination of Officer Rose the prosecutor questioned the officer about the finality of the search for the Bantam Bandit.

Q. (By Mr. Chancellor) This person that became known as the bantam robber, what was his general description?

A. General description that I had was a man of small stature, heavy build, black jacket.

Q. Okay. Was that the person when you mentioned that you were on assignment that you had reference to?

A. That's correct.

Q. Now, has this person since that time been apprehended?

MR. BRUNTRAGER: Object to this, Your Honor. That would be based on hearsay, be a conclusion on the part of the witness.

THE COURT: If he has knowledge, personal knowledge, if he has personal knowledge—

MR. BRUNTRAGER: Further, been no foundation laid for that.

THE COURT: All right, the objection will be overruled. You may proceed.

A. (By Mr. Chancellor) The person that became known as the ban—

A. Bantam bandit.

MR. BRUNTRAGER: Judge, because the question is being repeated I want the objection to be clear that it's for that question.

THE COURT: That's correct. Overruled.

MR. BRUNTRAGER: No foundation laid for that.

THE COURT: Overruled.

Q. (By Mr. Chancellor) Is that person— has that person been apprehended?

A. Yes, sir, to my knowledge.

*    *    *    *    *    *

Q. You're familiar that that investigation is closed, aren't you, Officer?

MR. BRUNTRAGER: Judge, now, if he didn't handle it how in the world would he know?

MR. CHANCELLOR: Because he was part of the investigation. That's why—

THE COURT: Well, you have to establish that.

Q. (By Chancellor) You were part of the investigation into the bantam robber, were you not?

A. I took one report, yes, sir.

Q. Are you familiar that that investigation is closed in the 6th District?

MR. BRUNTRAGER: Judge, no foundation laid for that.

THE COURT: Objection will be overruled. He can ask if it's closed.

A. Yes, sir.

Officer Rose did, in fact, have the requisite background to give firsthand testimony with regard to the Bantam Bandit investigation. He had worked on the investigation, wrote one report, and heard via police station channels that the Bantam Bandit case was closed. "An opinion, when not a mere guess or conjecture, but an inference drawn by one of requisite experiential capacity from adequate data, is evidence." 4 Wigmore on Evidence (2d Ed.) pp. 100–125. Officer Rose's involvement with the Bantam Bandit investigation and his experience in the police station with other officers constituted "requisite experiential capacity."

■ Even if West properly contends the state did not adequately establish that Officer Rose had the "requisite experiential capacity" to testify, and that he drew his conclusion from "adequate data," any error in admitting his testimony was nonprejudicial to the outcome of the case.

The state unnecessarily procured the above testimony to establish that the Bantam Bandit and the robber in the instant case were two distinct people. The record reflects that the jury had abundant testimony before them from which it could conclude that the Bantam Bandit and the Zantigo robber were two separate people. The Bantam Bandit was so described because of his small physical frame. The witnesses of the robberies that occurred October 8–18, 1986, the descriptions announced in the police station, and the police dispatch on the night of the Zantigo robbery, described the robber of Zantigo's and the previous six restaurants, as at least six feet tall with a large build.

The testimony the state elicited from Officer Rose was wholly unnecessary. It did not tend to prove any relevant fact in dispute. Furthermore, the point was entirely collateral to the matter the jury decided. Therefore, the state's action was nonprejudicial and we deny West's second point on appeal.

■ West contends in his third point on appeal that the trial court erred in denying his motion for a mistrial. West requested a mistrial after the prosecutor announced before the jury his intention of returning the money seized from West to Zantigo. West contends that the prosecutor's statement constituted a declaration of his opinion in the jury's presence, and an invasion of the jury's province.

During direct examination of Officer Burford, the state introduced $250 taken from West at the time of his arrest. The prosecutor suggested substituting a photograph for the money and said within the jury's hearing:

MR. CHANCELLOR: Your Honor, I'm going to offer 14A in lieu of the currency and it's my intention unless there's some objection to return this to Zantigo's at this point unless there's an objection.

MR. BRUNTRAGER: Just a moment, Your Honor. (The following proceedings took place at the bench outside the hearing of the jury:)

MR. BRUNTRAGER: Your Honor, I'm going to object to that last statement. That was highly improper what he said in the presence of the jury. What he said was, I'm going to return this money to Zantigo's. Now, that assumes that this money is Zantigo's. The officer that's on the stand now just testified he found it on the defendant. The question for the jury to determine was whether it's Zantigo's.

THE COURT: All right.

MR. BRUNTRAGER: When he turns around to me and says, I'm going to return this to Zantigo's that's a highly improper statement. I'll ask the jury be instructed to disregard it and a mistrial be declared.

THE COURT: I'll instruct the jury to disregard the last comment of the attorney with regard to returning money. What do we do—I'll deny the motion for mistrial. What do we do with regard to the money at this time? I would instruct you just to keep this money and any request with regard to how it should be handled will be made out of the presence of the jury.

MR. BRUNTRAGER: Can we agree that that was made in the presence of the jury?

THE COURT: The record reflects that. And we'll discuss the disposition of anything with regard to that outside the presence of the jury.

The determination of a mistrial is a drastic remedy granted only with the greatest caution and in the most extraordinary circumstances. *State v. Morgan*, 592 S.W.2d 796, 808 (Mo. banc 1980). The trial court has broad discretion in deciding whether to grant a mistrial. *State v. Gasaway*, 720 S.W.2d 3, 5 (Mo.App.1986). The trial court's decision whether to grant a mistrial should be overruled only if clear evidence exists that the trial court abused its discretion. *Morgan*, 592 S.W.2d at 808.

When improper statements are made before the jury, the trial court should attempt to cure the harm by counseling the jury not to consider the evidence or by implementing another measure less severe than a mistrial. *See, State v. Christensen*, 720 S.W.2d 738, 740 (Mo.App.1986). The trial court granted relief. It admonished the jury to disregard the prosecutor's statement concerning the return of the money to Zantigo's.

West further contends that the court erred in denying a mistrial because of the prejudicial likelihood that the jury would consider the statement to be the prosecutor's opinion. West's contention fails for two reasons. First, a prosecutor may state his opinion of the defendant's guilt as long as it is based on evidence presented at trial, rather than private knowledge beyond the evidence at trial. *See, State v. Newlon*, 627 S.W.2d 606, 617 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). Therefore, even if the statement constituted the opinion of the prosecutor, it did not require a mistrial in the absence of circumstances from which the jury could conclude it was an opinion based on personal knowledge of facts not in evidence.

Second, the prosecutor's statement did not encourage the jury to accept his opinion and to ignore the evidence presented. Nevertheless, the possibility of prejudice warranted judicial intervention on the part of the court. The court admonished the jury to disregard the prosecutor's statement.

The statements that led to West's second and third points on appeal were improper. Such trial tactics cast a shadow in a case where the direct evidence of guilt was plentiful. Nothing we say should be construed in any other manner than one of disapproval. The prosecutor's statement and the collateral evidence demean the criminal justice system. Such conduct may serve to deny both the state and the defendant their right to a fair trial. The general public has a right to expect a fair and a just trial. Here, the evidence was incidental and the court admonition was sufficient.

In his fourth point on appeal West challenges the state's use of five of six peremptory strikes against blacks, and also challenges the state's explanations for the strikes as pretextual. We find that the state offered case specific, racially neutral reasons sufficient to support the finding that peremptory challenges were not racially motivated.

The United States Supreme Court decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) created the issue. It holds that to make a prima facie showing that the state exercised its strikes in a discriminatory manner, the defendant must demonstrate that the facts and circumstances raise an inference that the strikes were exercised on account of race. Once made, the state may refute the prima facie case with clear, cogent, racially neutral reasons for each peremptory strike. 476 U.S. at 96, 106 S.Ct. at 1723 and 1723–24, fn. 20, 90 L.Ed.2d at 88–9. The state

may use peremptory challenges based on " 'conscious' and past experience, so long as racial discrimination is not the motive." *State v. Antwine*, 743 S.W.2d 51 (Mo.1987). If the state presents explanations, the defendant has the duty to show that the state's explanations were pretextual and actually founded on the racial factor. *Antwine*, 743 S.W.2d at 64.

The state struck five black venirepersons —Cayson, Robinson, Dinwiddle, Dandridge and Anderson—and one white, Dumey. The five venirepersons were struck for one of two reasons: either they had a relative who had spent, or was spending time, in prison; or, the person was young and had a poor employment history.

The prosecutor stated that he struck Cayson, Robinson and Dandridge because each had a relative who was convicted of a crime and had served, or was serving, time in a penitentiary. One white venireperson, Susan Pashos, stated that her sister had a charge pending against her for possession of marijuana. The state said that it did not strike Pashos because she did not have a relative convicted of a crime, merely a relative with an unsettled charge against her.

The state claimed it struck Dinwiddle, Dean and Anderson because they were young, unmarried, and had poor employment histories. Anderson testified that he was presently unemployed and had last worked at a nursing home for a year and a half. At least half the original venirepersons were younger than Anderson.

Dinwiddle testified he had held three different jobs during approximately the past three years. Dinwiddle was presently employed by Kelly Services as a temporary employee for whom he had worked the past year. He testified that before his present employment he had worked at National Supermarket for one year. Prior to his job at National, he worked at Sears for two and a half months. Dinwiddle was, in fact, the youngest venireperson.

Dean was struck by the state as an alternate on the grounds that he was young and unmarried. Although neither attorney posed questions specifically to Dean, the state felt that Dean's sympathies would lie with defendant because he could relate to the financial pressures defendant articulated in his official police statement.

After the state proffered the above explanations for its five peremptory strikes, the court ruled that the state's explanations were race neutral. The court stated:

THE COURT: All right. Okay. I'll be truthful that I don't know the parameters of the Batson decision. I haven't seen any—our Missouri Supreme Court indicated so much in its decision which the—Antwine, A–N–T–W–I–N–E, which recently came down as to when these challenges should be made.

\*    \*    \*    \*    \*    \*

I think that most of the reasons that the prosecutor have here contained—could be sustained as very legitimate reasons. I don't know where we'll go with the question of the young person who might be sympathetic because he is also in a similar category of age and perhaps financial status; what a court would do with that I don't know today.

I'm going to deny the motion and going to rule that the prosecutor gave sufficient neutral reasons for the striking of the blacks that were struck. I believe that the explanations given were sufficiently neutral and not race based and that the motion of the defendant to quash the jury panel will be denied.

Despite the court's reservations about the application of *Antwine* and *Batson*, we find that the guidelines set out in *Antwine*, support the trial court's action.

According to *Antwine*, peremptory challenges require that counsel rely on "perceptions of attitudes based upon demeanor, gender, ethnic background, employment, marital status, *age*, economic status, social position, religion and many other fundamental background facts." [Our emphasis] *Antwine*, 743 S.W.2d at 64. Based on this guideline, we find no error in the ruling. We affirm the trial court's decision that based on the entire voir dire, the charges and the facts, the prosecutor articulated neutral explanations for the peremptory strikes. *Id.*

■ We also note, as one of the relevant considerations, that black members composed 25% of the jury. In *Batson,* the court stated that when the state provides neutral explanations for the use of its peremptory strikes, the state must show that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Id.,* 476 U.S. at 92, 106 S.Ct. at 1721, 90 L.Ed.2d at 86 (citing *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). In *State v. Samuel Crump,* 747 S.W.2d 193 (Mo.App., E.D., 1988), this court held that "the fact that five blacks remained on the jury panel after the prosecutor used her peremptory challenges undercuts any inference of discrimination that may arise." *Crump,* at 196. In the instant case the peremptory strikes did not result in a monochromatic jury. The presence of three blacks on the jury undercuts the claim of error and supports the trial court's decision that West was not denied a fair and impartial jury.

West's final point on appeal contends the trial court committed plain error by sentencing him as a class "X" offender under Section 558.019. This requires defendant to serve at least forty per cent of his sentence as a prior offender. The court's retroactive application of the statute renders it an ex post facto law in that it disadvantages West by requiring him to serve at least twenty-four years of his sentence before applying for parole. Under the law applicable when the crimes were committed, barring misconduct, he could apply for parole after serving one year of his sentence.

■ West was charged with offenses committed October 8–18, 1986. Section 558.019 became effective January 1, 1987. The trial occurred on April 1–8, 1987. The court sentenced West on June 1, 1987. West contends the trial court erred in classifying him as a prior offender under Section 558.019, because its application increases the punishment after the commission of the crime and is, therefore, an ex post facto law.

Initially, we note that West did not properly preserve the issue for appellate review. The preservation of a constitutional argument for appeal requires the party to: (1) raise the constitutional issue at the first possible opportunity, (2) specifically designate the constitutional provision claimed to have been violated by expressed reference to the article and section of the Constitution or by quoting the provision itself, (3) state the facts showing the violation, (4) preserve the constitutional question throughout for appellate review.

*State v. Hyde,* 682 S.W.2d 103, 105 (Mo. App.1984). West did not make the necessary objection at trial, nor did West challenge the court's finding that he was a prior offender in his motion for new trial. Nevertheless, we will review the issue *ex gratia* for plain error. "Under this standard of review, the plain error complained of must impact so substantially upon the rights of the defendant that a manifest injustice or a miscarriage of justice will occur if left uncorrected." *State v. Driscoll,* 711 S.W.2d 512 (Mo. banc 1986).

After the original opinion was issued in this case, it was transferred to the Missouri Supreme Court on its order and retransferred to this court to consider this issue in light of *State v. Lawhorn,* 762 S.W.2d 820 (Mo. banc 1988). In *Lawhorn,* the Supreme Court decided application of Section 558.019 RSMo 1986, effective January 1, 1987 was retrospective since the offenses occurred prior to January, 1987. It also held that Lawhorn was disadvantaged by application of the law to him. The decision in *Lawhorn* reaches the conclusion we previously reached that this case must be remanded for re-sentencing. *State v. Lawhorn,* at 823–826. Lawhorn decided that the statute violates the prohibition against ex post facto laws found in Article 1, Section 10 of the United States Constitution and Article 1, Section 13 of the Missouri Constitution if applied to crimes charged on acts committed before January 1, 1987.

The application of Section 558.019 RSMo 1986 is retrospective and substantially disadvantages West by removing an existing

statutory right; therefore, the trial court's application of the statute renders it an ex post facto law. The court's ruling "impacts so substantially" upon West's rights "that a manifest injustice ... will occur if left uncorrected." *Driscoll,* 711 S.W.2d 512. Thus, the court committed plain error in applying Section 558.019.

We affirm the conviction of West. However, we remand for re-sentencing consistent with this opinion.

SMITH, J., and JOHN J. KELLY, Jr., Senior Judge, concur.