UNITED STATES of America, Plaintiff-Appellee,

v.

Ramon Pedro HERNANDEZ, Defendant-Appellant.

No. 72–1981.

United States Court of Appeals, Seventh Circuit.

Heard Sept. 10, 1973.

Decided Oct. 3, 1973.

Prof. Francis X. Beytagh, Notre Dame, Ind., for defendant-appellant.

Donald B. Mackay, U. S. Atty., Springfield, Ill., Max J. Lipkin, Asst. U.

S. Atty., Peoria, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and STEVENS, Circuit Judges.

PER CURIAM.

After a jury trial, defendant was sentenced to concurrent terms of 5-years' imprisonment under three counts of an indictment charging him with the unlawful transportation of aliens, as proscribed by 8 U.S.C. § 1324(a)(2).[1]

On the night of June 13, 1971, Corporal Kettman of the Illinois State Police in Pontiac, Illinois, was on a tour of duty in a patrol car. At 11:45 p. m. he observed a 1970 Ford van, bearing 1971 Illinois license plates number PF 8083, being driven by defendant three miles south of Odell, Illinois. Kettman required defendant to pull over and stop on the basis of the following message received over the police radio in his squad car:

> "REPORT CAR AT LINCOLN ILLEGAL ENTRIES ALIENS WHITE FORD SPORTVAN BDL 70 MODEL SEVERAL MEX. SUBJECT IN IT COVERED UP BY BLANKET 71 IL PF 8083 LEFT LINCOLN 10 10P DRIVER ASK DISTANCE JOLET" (sic)

This bulletin was transmitted from the Illinois State Police headquarters in Springfield, Illinois, to the Pontiac Police Department, which in turn dispatched it to police cars operating out of Pontiac. The bulletin was apparently inspired by observation of the van containing "people in the back * * * under covers * * * [who] would not show themselves" at a service station in

---

1. This Section provides in pertinent part:
   "(a) Any person * * * who—
   *　*　*　*　*
   "(2) knowing that he [any alien] is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;
   *　*　*　*　*
   any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony * * *."

the vicinity of Lincoln, Illinois. The record does not disclose who observed the van and notified the police, but defendant's brief states "Officer Kettman believed the information was called in from a service station" in Lincoln.

After his van was stopped, defendant left the vehicle. Upon being asked for his driver's license, he replied that he did not have any. Kettman's fellow officers shone their flashlights into the windows of the van and observed numerous persons lying inside under blankets. Defendant was put under arrest at the scene and the twenty occupants of the van were removed and searched "for their own protection." Kettman asked defendant "if he was hauling wetbacks," and he admitted that he was. He was arrested for driving without a driver's license.

A motion to suppress was filed, urging the district court to exclude "all evidence and testimony concerning the possession of alleged illegal entrants being present in this [defendant's] motor vehicle on June 13, 1971." The principal ground for the motion was that the only basis for stopping the van was the above-quoted police bulletin which contained "no reference to the identity of the person who supplied the information nor to the credibility or reliability of the informant."

■ Careful analysis requires recognition of the fact that three legally separable events, *viz.*, stopping the van, arresting defendant and searching the van, occurred in rapid succession after Corporal Kettman turned on his flashing light behind defendant's van. But stopping the van, briefly questioning the occupants, and observing anything which could be seen from outside the van constituted only an investigatory stop. Whiteley v. Warden, 401 U.S. 560, 566–567, 91 S.Ct. 1031, 28 L.Ed.2d 306. This was followed by the arrest of Hernandez and the search of the van.

Because of the information contained in the police bulletin, it is clear that Corporal Kettman had authority to stop defendant and conduct temporary questioning. Under the rationale of Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, we conclude that the facts available to Kettman at the moment he stopped and questioned defendant " 'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate." As Chief Justice Warren there observed, "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."

A recent decision elaborating these principles is Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, where the Supreme Court sustained an investigatory stop of a suspect in a parked car. In that case the "stop and frisk" officer had been advised by an informant that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist" (at p. 145, 92 S.Ct. at p. 1922.) As the Court there stated:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or to allow a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 145–146, 92 S.Ct. at 1923.

Applying these principles to the present case, we believe that Corporal Kettman acted justifiably in responding to the police bulletin even though the bulletin was insufficient to support an arrest or search warrant. Here the police bulletin described defendant's vehicle by year, model and license plates and

stated that it carried Mexicans, covered by blankets, who had entered the country illegally. When stopped, it was on a route from Lincoln to Joliet at an appropriate time, just as indicated in the bulletin. Clearly, sufficient criminal behavior was outlined in the radio dispatch to justify this investigative stop.[2] Once the van was stopped, its illegal contents were in plain view and there was probable cause for the subsequent arrest and search.

To support reversal, defendant relies principally on Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306. In that case, an arrest warrant was issued without probable cause. Subsequently, the Sheriff of Carbon County, Wyoming, issued a statewide radio bulletin describing Whiteley and his companion and requesting the assistance of other law enforcement agencies in apprehending them. City police officers in Laramie, relying on the radio bulletin, stopped, arrested and searched the defendants. The Supreme Court held that the Laramie police had no probable cause to make the arrest and search incident thereto, because the radio bulletin on which they relied was issued without probable cause, and the officers did not observe other facts sufficient to give them probable cause.

■ However, a careful reading of Whiteley reveals that it supports the result we have reached in this case. Although the radio bulletin was not sufficient to support an arrest, it was sufficient to support an investigatory stop. Justice Harlan was careful to point out in Whiteley that "the Laramie police were entitled to act on the strength of the radio bulletin." 401 U.S. at 568, 91 S.Ct. at 1037. The Court clearly contemplated that the arresting officer would have an opportunity to stop the suspect and attempt to corroborate the radio bulletin before making an arrest. Justice Harlan's opinion enumerated every fact known by the arresting officers before concluding that they acted without probable cause. The last fact considered by the Court is particularly significant here.

"[T]he information possessed by the Laramie police officer at the time of arrest and search consisted of: * * * (5) the knowledge, *acquired by the officer after stopping Whiteley*, that he had given a false name." 401 U.S. at 566–567, 91 S.Ct. at 1036 (emphasis added).

In a footnote, the Court distinguished this information from other evidence the officers found while searching the car after Whiteley's arrest. It is thus clear that information obtained by police officers after stopping a moving vehicle at the side of the road to question the driver briefly can be used to justify a subsequent arrest of the driver and a search of the vehicle incident to that arrest.

■ There were no more grounds for issuing the radio bulletin in *Whiteley* than in this case, and the bulletin gave no more information. The difference in the two cases is that here the officers were able to see evidence of criminal conduct sufficient to constitute probable cause without searching the vehicle; in *Whiteley* no such evidence was visible. The motion to suppress in this case was properly denied.

Defendant concedes that there was substantial evidence that the three alien witnesses entered the United States about June 12, 1971, by walking with a rope across the Rio Grande River and

2. The internal evidence of reliability provided by the details in the police bulletin (which were corroborated by the observations of the arresting officer before he stopped defendant's vehicle) outweigh, in our opinion, the risk of acting on the basis of information that might have been supplied by an anonymous informant. We mention this point because, particularly when the case is one in which there is a risk that suspicion of criminal behavior may be prompted by nothing more than an ethnic identification, it is essential that even an investigative stop be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889.

that none of them was legally entitled to enter or remain within the United States. However, he argues that the Government failed to prove that he knew the Mexican aliens he transported from Texas to Illinois were illegally in the United States. Such knowledge is an element of the offense charged (see note 1 *supra*), but the record abounds with evidence thereof. Thus defendant told Ralph Johnson, an investigator for the Immigration and Naturalization Service, that he had purchased the van to transport aliens from the Texas-Mexican border to Joliet, Illinois, and that was his only means of livelihood. Defendant also told Johnson that he picked up this group of aliens in Texas, near Rio Grande City, and loaded them into his 1970 van and brought them north. Defendant said he collected $5 from each and was to collect $195 more in Joliet, Illinois, the point of destination, or a total of $4,000 for the trip.

One of the aliens, Luis Salazar, testified that defendant picked him up in native dress in a truck in a Texas bush area and transferred him to the Ford van, telling the alien to cover himself. Defendant covered him on a later occasion and told all the aliens in the van to cover themselves well at a gasoline stop.

Jesus Margana, another alien, testified that he saw defendant a half-hour after crossing the Rio Grande and that twenty of the Mexicans got into defendant's truck after hiding in a wooded area. They were then driven with a "kind of cover over them" for another half-hour to another wooded area.

The third alien to testify without objection was Tomas Perez-Alverez. He also stated that he was picked up in a truck in a wooded Texas area and then transferred to the Ford van. He said that defendant was the truck driver.

At the trial, Officer Kettman testified that when he stopped defendant's van near Odell, Illinois at 11:45 P.M., there were twenty men in the back, and that the defendant driver was the only occupant in the front seat.

 The jury could properly infer defendant's guilty knowledge from his admissions to investigator Johnson, from his furtiveness, from the high price paid for very uncomfortable transportation, and from the dress of at least one of the aliens when defendant picked him up near the border. In concluding that the Government proved its case, we have not considered materials improperly contained in its brief that were not before the jury.

Judgment affirmed.