**STATE of Iowa, Appellee,**

v.

**Jerry Dee DONNELL, Appellant.**

No. 58328.

Supreme Court of Iowa.

March 17, 1976.

Robert S. Swanson, of Winston, Schroeder & Reuber, Mason City, for appellant.

Richard C. Turner, Atty. Gen., William D. Scherle, Asst. Atty. Gen., and Clayton L. Wornson, County Atty., for appellee.

REYNOLDSON, Justice.

. Defendant, appealing from his conviction for violating § 712.1, The Code (receiving stolen property) raises issues relating to an investigatory stop of a van in which he was a passenger, and speedy trial, § 795.2, The Code.

Evidence was introduced at a pre-trial suppression hearing and upon trial of this case which would support the following factual statement.

On the early morning of November 22, 1974 defendant Donnell was the sole passenger in a red van driven by his roommate Uglem. This vehicle had been seen cruising very slowly through three Clear Lake residential areas several blocks apart before its driver was halted by a city patrolman at 2:00 A. M.

The evidence disclosed Clear Lake is a city with many vacant homes in the winter months. Over the prior year residential

break-ins had totaled "almost in the hundreds." Large quantities of furniture and other bulky items had been stolen and apparently carried away by van or truck.

Officer Nuehring made the decision to halt the van. He was motivated by the circumstances above described, not by any traffic violation, mechanical defect or routine purpose to invoke § 321.492, The Code (permitting stops for license check and other specified reasons). Nuehring made a radio request for back-up assistance from officer Garlock.

Nuehring approached the driver's side of the van. Garlock walked up to the window on the passenger side and recognized the defendant. The light of Garlock's flashlight disclosed what appeared to be a "roach" (marijuana cigarette butt) on the floor of the van at defendant's feet. This roach was obviously hand-rolled in distinctive red cigarette paper, with one end twisted in a typical fashion and the other end burned. Garlock asked defendant to step out of the car. He picked up the roach, confirmed it had a characteristic marijuana odor, and then retrieved another from the open ashtray.

Defendant was searched and found to be carrying 51 "white cross" amphetamine tablets. He resisted being handcuffed and the roaches which were in Garlock's hand were destroyed in the resulting scuffle. At the police station booking search credit cards stolen from a burglarized farm home were found in defendant's wallet. This led to a warrant search of his apartment where household items also stolen from the farm house were seized. This personalty formed the basis for defendant's ultimate conviction.

I. Defendant filed a motion to suppress any evidence removed from the van, his person, his wallet or his apartment, asserting there was no probable cause to make an investigatory stop of the van in which he was riding. Defendant thus identifies the fighting issue, for if this stop was justified then Garlock was in a place he had a right

to be when he saw and seized the roach which triggered all subsequent events. See *State v. Cooley,* 229 N.W.2d 755, 760 (Iowa 1975) and citations.

In *Cooley,* supra, we adopted the principle articulated in *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906–907 (1968), where the court noted "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Circumstances for an investigatory stop exist "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experiences that criminal activity may be afoot * * *." *Id.,* 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for a probable cause arrest to simply shrug his shoulders and allow a crime to occur. *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616 (1972). Nor does that amendment ordinarily prohibit, as an illegal "search", a plain view observation made by a police officer from a position where the officer is entitled to be. *United States v. Johnson,* 506 F.2d 674, 675 (8 Cir. 1974), cert. denied, 421 U.S. 917, 95 S.Ct. 1579, 43 L.Ed.2d 784 (1975).

A vehicle investigatory stop complying with the *Terry* standards may include observing anything to be seen from outside the vehicle. *United States v. Hernandez,* 486 F.2d 614, 616 (7 Cir. 1973), cert. denied, 415 U.S. 959, 94 S.Ct. 1488, 39 L.Ed.2d 574 (1974). The "plain view" doctrine is applicable even though the contents of the vehicle may not have been visible without the use of a flashlight or other artificial illumination. *United States v. Johnson,* supra, 506 F.2d at 676.

In determining whether the court erred in overruling the motion to suppress

we may consider not only the evidence adduced in the motion to suppress but the later trial testimony. *United States v. Upthegrove,* 504 F.2d 682, 684, n. 4 (6 Cir. 1974); see *DiBella v. United States,* 369 U.S. 121, 129, 82 S.Ct. 654, 659, 7 L.Ed.2d 614, 620 (1962); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925).

Nor does our examination of reasonable cause for an investigatory stop end with the officer's subjective reasons. The test is not the policeman's subjective theory, but whether the record discloses articulable objective facts were available to the officer to justify the stop. *United States v. Vital-Padilla,* 500 F.2d 641, 644 (9 Cir. 1974); *White v. United States,* 448 F.2d 250, 252 (8 Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972); *United States v. Harflinger,* 436 F.2d 928, 933 (8 Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971); see *Terry,* supra, 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906; *Cooley,* supra, 229 N.W.2d at 759 ("[W]e must objectively determine whether stopping of said vehicle * * * was reasonable under the circumstances").

Applying the above principles, the following information was available to officers involved in this investigatory stop:

(A) This van was seen in a small Iowa city.

(B) The city policeman did not recognize the van, the operator, or the passenger prior to the stop.

(C) Clear Lake had been subjected to a crime wave of home burglaries.

(D) Many Clear Lake homes were vacant during the winter months.

(E) The van was being driven very slowly.

(F) The officers observed it in three separate residential areas.

(G) This occurred at 2:00 A. M., a time when most persons in a residential area would be asleep.

(H) The type of vehicle was peculiarly adapted to concealed transport of bulky household furniture and equipment of the type being stolen.

We have carefully compared the circumstances disclosed above with those in *United States v. Harflinger,* supra, and *Carpenter v. Sigler,* 419 F.2d 169 (8 Cir. 1969) (stops held valid) and with those in *United States v. Nicholas,* 448 F.2d 622 (8 Cir. 1971), and *Cooley,* supra (stops held unjustified). Although the question is close, we find the facts *sub judice* most analogous to those in *Carpenter v. Sigler,* supra. We hold this investigatory stop was based upon reasonable grounds.

Trial court was right in overruling the motion to suppress.

II. Defendant next asserts we must reverse because he was not provided a trial within the time provided in § 795.2, an issue he raised below by motion to dismiss.

The county attorney's information charging defendant with this crime was filed February 5, 1975. February 18, 1975, a trial assignment was tentatively made, setting trial for any of the weeks of March 24, April 1 or April 7. February 24, 1975, defendant filed the motion to suppress referred to in division I. Hearing on this motion was had March 6, 1975. An extensive eight-page ruling was filed April 1, 1975, a Tuesday.

The parties agree the first court day following expiration of the § 795.2 60-day period was Monday, April 7. The following day, April 8 defendant filed his motion to dismiss. This motion was heard and overruled on April 11. Defendant's trial was scheduled for, and commenced, April 21.

In these dismissal hearings at the trial court level the burden is on the State to show good cause for delay. In *State v. Shockey,* 214 N.W.2d 146, 150 (Iowa 1974) we said factors to be considered were those delineated in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): length of delay, reason for the delay, defendant's

assertion of his speedy trial right, and prejudice to defendant resulting from the delay.

■ At this level our review of the ruling on this issue is not *de novo.* To secure a reversal defendant must show trial court abused its limited discretion. *State v. Grady,* 231 N.W.2d 869, 872 (Iowa 1975); *State v. Albertsen,* 228 N.W.2d 94, 98 (Iowa 1975).

Turning to the four above criteria in weighing trial court's action, we note similar delays, although short, have been rejected as furnishing "good cause" where unaccompanied by reasonable excuse. See *State v. Sassman,* 226 N.W.2d 808, 809 (Iowa 1975); *State v. Hines,* 225 N.W.2d 156, 159 (Iowa 1975); *State v. Nelson,* 222 N.W.2d 445, 449 (Iowa 1974). Still, the fact the delay beyond the § 795.2 period incurred here is not lengthy gives it less weight in the ultimate determination to be made.

■ Delay attributable to defendant may constitute statutory good cause preventing the State from carrying out its obligation to bring him to trial. *State v. Lyles,* 225 N.W.2d 124, 126 (Iowa 1975). In this case the defendant waited nineteen days after the charge was filed to make a motion to suppress. His appellate brief points out the evidentiary hearing on the motion consumed only two hours, following which trial court took 26 days to file a ruling. But the point raised by the motion to suppress was very close, as division I hereof may indicate. Trial court's eight-page ruling reflects serious concentration on the facts, considerable research in the law, and reflective consideration of the merits.

While the time consumed by trial court might have been inexcusable had it been confronted with a routine issue, or had this been the only matter before it, we are reluctant to imply trial court cannot take the time necessary to properly study and rule on a defense motion going to the very heart of a criminal case.

Standard 2.3(a), ABA Standards Relating to Speedy Trial, Approved Draft 1968, provides the period of delay resulting from other proceedings concerning the defendant, including hearings on pre-trial motions, should be excluded in computing time for trial. While such a rule probably should not be inflexibly applied, it has merit in this situation. The nineteen days consumed by defendant in preparing and filing his motion cannot be ignored when examining the lesser time interval which elapsed following expiration of the 60-day period. As bearing on this point, see *State v. Truax,* 232 N.W.2d 861 (Iowa 1975); *State v. Grady,* 231 N.W.2d 869 (Iowa 1975); *State v. Albertsen,* supra; *State v. Lyles,* supra; cf. *State v. Wright,* 234 N.W.2d 99 (Iowa 1975).

Turning to the third factor, defendant, although represented by counsel, failed to demand a speedy trial. On this factor, the scales are tipped in the State's favor. See *State v. Lyles,* supra, 225 N.W.2d at 126.

Finally, defendant argues prejudice was established because of his incarceration. While the record is unclear, there is an indication his incarceration was not due solely to this charge. Defendant was initially placed in the county jail. His girlfriend posted bail. In January 1974, he was reincarcerated. This may have been on a charge of violating his probation granted on a prior drug charge conviction or because his friend wanted the bail money returned. The record also reflects two other pending charges, one which arose out of this incident and another involving a concealed weapon offense arising during his confinement. Certainly the trial court, examining the issue of prejudice by reason of incarceration on this charge during the short delay period, could have found defendant would not have been at liberty in any event.

Under this record we hold it was not an abuse of discretion for trial court to find the State established good cause for the delay in bringing defendant to trial.

We find no reversible error.

AFFIRMED.

MOORE, C. J., and LeGRAND, REES, UHLENHOPP and HARRIS, JJ., concur.

RAWLINGS and McCORMICK, JJ., dissent.

MASON, J., takes no part.

RAWLINGS, Justice (dissenting).

I am unable to agree with the reasoning or result reached in Division I of the majority opinion, therefore respectfully dissent.

Significantly, the court declared in *Terry v. State of Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968):

"[I]n justifying the particular intrusion *the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.* The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: *would the facts available to the officer at the moment of the seizure* or the search *'warrant a man of reasonable caution in the belief'* that the action taken was appropriate? [Citations]. *Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.* [Citations]. And *simple '"good faith on the part of the arresting officer is not enough."* * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects", only in the discretion of the police.' [Citation]." (emphasis supplied).

See also *State v. Cooley,* 229 N.W.2d 755, 756 (Iowa 1975).

Unquestionably, Officer Nuehring's stop of the instantly involved red van constituted a seizure of the person within the context of the Fourth Amendment. See *State v. Cooley,* 229 N.W.2d at 759.

I submit Officer Nuehring, acting alone in making the initial and determinative stop and seizure of the person, did so absent articulated cause to reasonably believe criminal activity on the part of the van occupants was then afoot. More precisely, as disclosed, *infra,* the officer acted upon nothing more than totally inadequate suspicion and conjecture. See *State v. Cooley,* 229 N.W.2d at 760–761.

It is to me evident the court below impermissibly buttressed, and now the majority likewise attempts to bolster Officer Nuehring's inadequate articulated cause for stopping the vehicle by reference to facts not shown to have been known to him when he stopped the van. Such a "drag-net" rationale will only serve to create a sea of uncertainty in futuro for courts, attorneys and peace officers.

In support of the foregoing I refer first to these relevant portions of the record before us regarding Officer Nuehring's testimony in course of the hearing on defendant's pretrial suppression motion:

"The sole reason Officer Nuehring stopped the vehicle was because it was traveling slowly in the Mars Hill Drive Residential Area. After he stopped the vehicle, he was going to try to find from the driver why they were cruising the residential areas. He asked the driver of the vehicle basically just what he was doing, cruising the residential areas that hour of the night. He asked the driver to produce his driver's license only. That there was nothing wrong with the driver's license and he returned it. That he discovered no contraband in the vehicle nor did he ever observe any contraband in the vehicle.

"The Court directed the counsel for the Defendant to find out why the Officers stopped the vehicle on grounds that there had been no showing to the Court that there was any probable cause to stop the vehicle. The Court stated that the fact that the vehicle was driving slowly was not a crime and that the driver could cruise around in the residential district all he wanted to.

"In response to the inquiry made by the Court, Officer *Nuehring testified that he had no prior information from the radio dispatcher that this vehicle had been suspected of use in any criminal activity. He had no prior information from any source that this vehicle was used in any criminal activity. From his observation of the vehicle that he thought that possibly a burglary element was involved on the basis that the vehicle was just cruising residential areas in a late hour.*

" * * * Officer Nuehring testified further than the vehicle in which the defendant was riding was not the particular red van operated by some known law violators at the lake.

"On re-direct examination, Officer Nuehring testified that he stopped the vehicle in the Mars Hill Drive area, which is a street that goes by the Dairy Queen and the Sunset Elementary School, a very curvy street which allows parking, so that it would be difficult to travel very fast on that street under any circumstances. *Officer Nuehring testified that his purpose in stopping the vehicle was to find out what was going on, what they were doing, and incidental to that purpose he asked the driver to produce his license by way of identification.*" (emphasis supplied).

Further in the same vein Judge Sullivan, in ruling on the aforesaid motion, specifically found:

"In this particular case, Officer Nuehring first saw the vehicle on North Ninth Street, then he again saw the vehicle on the dead-end street in the Mars Hill area and he asked the driver of the van to produce his driver's license, and at that time did not see any contraband in the vehicle. *He had not received any dispatch of any criminal activities in the area; he had not received any warning by other peace officers to be on the lookout for such a vehicle, but* because there had been many break-ins in the area, *he thought perhaps* a burglary might be involved. He found the vehicle in good operating order and he had known of other violators operating in the resort area in a red van; however, on direct examination, his purpose in stopping the vehicle was to find out what was going on. He did not stop the vehicle to obtain a view of the Defendant's driver's license, and appeared to be only incidental. *He did not stop the vehicle for a driver's license check.* The Court finds that none of the provisions of 321:492 were applicable. There was no notice from other authorities, and *he was suspicious* because the vehicle was driving slow and there had been burglaries in the area with a van, although this Defendant was not the operator of the van." (emphasis supplied).

I submit the showing made upon which this court must act falls far short of a moment-of-action reasonable cause for stopping a vehicle on one of our public highways. This wrongful intrusion, if here sanctioned, will surely open the door to indiscriminate and capricious stopping of any and every automobile engaged in legitimate affairs by peace officers acting upon nothing more than whim, fancy, caprice or suspicion. This I cannot sanction. See *Carroll v. United States,* 267 U.S. 132, 153–154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). See also *Beck v. State of Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1946).

Mindful of the foregoing, I would hold Nuehring and the later arriving Officer Garlock were not in a place where they had a right to be after the van had been stopped. Consequently, nothing seen by

them in the vehicle or obtained by a search of same or of the person of the occupants can withstand applicable constitutional mandates.

By the same token any subsequent searches were fatally tainted by the triggering "poisoned" vehicle stop.

I would reverse.

McCORMICK, J., joins this Dissent.