**UNITED STATES of America, Plaintiff,**

v.

**Shantae Monique JONES, Defendant.**

**No. Crim. 01–50005.**

United States District Court, E.D. Michigan, Southern Division.

May 18, 2001.

Federal Defender's Office, Detroit, MI, for defendant.

Robert W. Haviland, U.S. Attorney's Office, Flint, MI, for plaintiff.

Kenneth R. Sasse, Federal Defender Office, Flint, MI, for defendant.

*OPINION AND ORDER*

GADOLA, District Judge.

Before the Court is Defendant's motion to suppress evidence [docket entry 9]. After considering the parties' briefs and supplemental briefs, and after having conducted an evidentiary hearing on the record, the Court grants in part and denies in part Defendant's motion.

## I. BACKGROUND

A grand jury has indicted Defendant on two counts. The first count is possession of a firearm with an obliterated serial number (18 U.S.C. § 922(k)). The second count is possession with intent to distribute crack cocaine (21 U.S.C. § 841(a)(1)). Those charges stem from the following events.

On February 14, 2001, Flint police sent an informant into 1502 Illinois to make a controlled buy of illegal narcotics. This informant was unable to purchase drugs because the target seller was not there. The informant told police, however, that another person at 1502 Illinois advised the informant that the target was at Old Frank's Bar, 2012 Lewis Street, attempting to replenish his supply of narcotics. The informant also relayed that the target was a stocky black man in an old, light green Cadillac. Police then began to watch Old Frank's Bar and observed Defendant, who fit the description provided by the informant, near and in a silver Cadillac in the parking lot of Old Frank's Bar. Police also saw Defendant's sister in the Cadillac. Police did not yet see the

two children of Defendant's sister, aged one and four, who also were in the auto.

Beginning around 7:00 p.m., police began following the Cadillac. Over the next few hours, police observed the Cadillac stop at several locations, including the home of Defendant at 1826 Walcott, Flint (twice), the home of Defendant's paramour, the parking lot of Chi Chi's Mexican Restaurant, and a Best Buy store. The latter two places are located near Miller Road in Flint Township, in an area that police testified is known as a place that narcotics traffickers conduct business with one another. At each of these locations except Best Buy, Defendant left the auto and returned several minutes later, while his sister and two nephews waited in the vehicle. At the Chi Chi's parking lot, in particular, police testified without contradiction that they saw Defendant enter and exit a white Jeep Cherokee. Officer Marcus Mahan also testified that, each time Defendant returned to the Cadillac, he observed Defendant manipulating something that was on the car's floorboard and between Defendant's legs. Officer Mahan reported this information to his supervisor in charge of the operation, Sgt. Harold Payer of the Flint Police. At Sgt. Payer's command, police stopped the auto, and with it Defendant, at 9:40 p.m.

Sgt. Payer testified that, viewed in light of his twelve years' experience as a narcotics investigator, what he saw and what his fellow officers saw and reported to him that evening made him suspicious of drug activity. That suspicion, coupled with the informant's information, led him to stop the Cadillac.

Police then approached the vehicle and, according to Sgt. Payer, sought permission to search the auto. Defendant avers that his sister did not consent to the search of the Cadillac, which she was driving and which belonged to her, and Defendant presented his sister's testimony to that effect. Plaintiff alleges that Defendant's sister did consent to a search of the auto, and has presented Sgt. Payer's testimony to that effect.

Regardless of whether Defendant's sister consented to a search, police did search the Cadillac and found a binocular bag containing the firearm that forms the basis for the first count in the indictment. Police then arrested Defendant [1] for carrying a concealed weapon in a motor vehicle in violation of Michigan state law and took him to an interrogation room at the police station.

Sgt. Payer's uncontradicted testimony was that, at 11:23 p.m. on February 14, Defendant was read his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and that Defendant waived those rights. (Hrg.Tr. at 89–90.) Sgt. Payer also related that Defendant initially gave conflicting accounts of where he lived during his processing at the police station. Sgt. Payer further testified, however, that police used a key that they had taken from Defendant at the police station to turn the lock to 1826 Walcott and thereby verify Defendant's place of residence. At that point, however, police did not enter the residence. Once Defendant heard radio transmissions to the effect that his key had turned the lock at 1826 Walcott, so Sgt. Payer testified, Defendant admitted that he lived at that address. Sgt. Payer then testified that he requested, and Defendant gave, permission for police to enter his home and seize three firearms that Defendant had stored in the dwelling.

1. Although police also arrested her on February 14, Defendant's sister has absolutely no criminal history and faces no charge whatsoever in this case.

Sgt. Payer testified that, while looking for the weapons, police found what appeared to be cocaine residue in plain view. According to Sgt. Payer, police remained in Defendant's house, after they had seized the firearms, until their colleagues brought a field-test kit. Police then tested the apparent residue and confirmed, to their satisfaction, that the residue was indeed cocaine. The police at Defendant's house radioed to Sgt. Payer that cocaine residue was in Defendant's home. Sgt. Payer stated that he then asked Defendant's permission to search the entire house, which Defendant provided. Sgt. Payer testified that police then searched the home, forced open Defendant's safe, and found roughly 220 grams of crack cocaine and $7,000.00.

Defendant then made inculpatory statements to Sgt. Payer late on the night of February 14 or during the early morning of February 15. Defendant next met with Drug Enforcement Administration Task Force Agent Cedric Kendall between 6:00 and 7:00 p.m. on February 15, 2001 and made further incriminating statements. (Hrg.Tr.104:15–25.) Agent Kendall does not think that Defendant's *Miranda* rights were reread to him before that second interview. (Hrg.Tr.104:18–19.) Throughout the events in question, police never had a warrant to conduct either a search or a seizure.

Defendant argues that the following police activity was illegal: (1) the stop of the Cadillac; (2) the search of the vehicle and the binocular bag; (3) the use of the key at Defendant's home and the alleged invasion of the curtilage surrounding the home; (4) the initial entry into Defendant's home to seize weapons; (5) officers remaining in Defendant's home after seizing the weapons; and (6) the search of Defendant's home, including a locked safe. Defendant requests that the Court suppress all evidence derived from these searches and seizures. Defendant contends that the Court must suppress both the physical evidence police seized and Defendant's inculpatory statements.

The Government argues that the officers' searches and seizures were constitutional because: (1) the officers' stopping of Defendant's vehicle was a legal, investigatory stop; (2) Defendant's sister consented to the search of the vehicle; (3) Defendant consented to the search of his residence; and (4) Defendant volunteered the statements he made to police on February 14 and 15.

### II. Legal Standard

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search not conducted pursuant to a warrant issued by a magistrate is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

█ A defendant seeking to challenge the warrantless search or seizure of a vehicle or other piece of property pursuant to the Fourth Amendment must first establish that he has standing to put forth such a challenge. *See Thomas v. Ivezaj,* No. 96–1775, 1997 WL 720448, at *2 (6th Cir. Nov.12, 1997); *United States v. Hartwell,* 67 F.Supp.2d 784, 793 (E.D.Mich.1999) (Gadola, J.); *see also United States v. Francis,* 646 F.2d 251, 254 (6th Cir.1981) (noting that the district court had considered the issue of standing sua sponte). Specifically, he must show, by a preponderance of the evidence, that (1) he manifested a subjective expectation of privacy in the object of the challenged search and

(2) society is prepared to recognize that expectation as legitimate. *Hartwell,* 67 F.Supp.2d at 793 (citation omitted); *United States v. Eley,* No. 93–162, 1993 WL 370614, at *2 (E.D.La. Sept.9, 1993).

Once the defendant has established standing in a case in which the search was not conducted pursuant to a warrant, the burden shifts to the Government to establish, by a preponderance of the evidence, that an exception to the warrant requirement applies. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Van Lewis,* 409 F.Supp. 535, 541 (E.D.Mich. 1976).

## III. Discussion

### A. Stop of the Cadillac

A passenger has standing to challenge, pursuant to the Fourth Amendment, officers' stop of a vehicle in which he is riding. *United States v. Guillen,* No. 97–1086, 1998 WL 252759, at *3 (6th Cir. May 12, 1998) (citing *United States v. Carter,* 14 F.3d 1150, 1154 (6th Cir.1994)). This is so because the officers' detention of the occupants of an auto during the stop of that vehicle, regardless of the limited duration and purpose of the stop, is a seizure of persons under the Fourth Amendment and must therefore be reasonable. *United States v. Williams,* 114 F.Supp.2d 629, 630–31 (E.D.Mich.2000) (Gadola,J.) (citation omitted). Such a stop is reasonable when the police know facts that give rise to a reasonable suspicion that a violation of the law is afoot. *Id.* at 632.

In this case, the Government argues that a "review of the activities and observations for the two hours and forty minutes preceding the stop, along with Sgt. Payer's prior experience and knowledge from the informant, lead to the inevitable conclusion that [Sgt. Payer] had an articulable reasonable suspicion that criminal activity was afoot by the passenger of the Cadillac vehicle." (Pl.Br. at 10.) It would have been helpful if Plaintiff had more precisely delineated what gave rise to reasonable suspicion in the argument section of its brief. The Court nonetheless has reviewed carefully the evidence that Plaintiff has marshaled and concludes that reasonable suspicion supported the officers' stop of the Cadillac.

The Court turns first to the informant's tip. Whether a tip creates reasonable suspicion depends upon its content and origins. *Id.* at 633. Most cases in which reasonable suspicion based on a tip exists fall into one of two categories: either the police will have corroborated aspects of a detailed tip, or the informant will have had a record of providing reliable information. *Id.* In this case, there is no evidence that the informant had a history of providing reliable information. The Court therefore considers whether the informant provided a detailed tip and the police corroborated aspects of that detailed tip before stopping Defendant.

The tip at bar indicated that a stocky black man in an old, light green Cadillac at Old Frank's Bar would be attempting to obtain cocaine for resale at the time in question. Except for the color of the Cadillac, which was actually silver, police corroborated through their own observation all but one of the verifiable details of that tip. Defendant was, indeed, a stocky black man in an old Cadillac at Old Frank's Bar at the time in question. That the Cadillac was silver instead of green is not dispositive because the Court knows of no authority for the proposition that every detail of a tip must be precisely accurate in order to create reasonable suspicion.

All of those corroborated details, however, were innocent. That is to say, there is nothing criminal or suspect about being a

stocky black man in an old Cadillac at Old Frank's Bar at a specific time. It is unclear whether the officers' corroboration of inherently innocent details of a tip could create reasonable suspicion that would justify an investigatory stop. The Court is aware of no binding authority on point, but the weight of persuasive authority suggests that corroboration of innocent details could create reasonable suspicion. *Compare United States v. McClinnhan,* 660 F.2d 500, 502 (D.C.Cir.1981) (reasoning that corroboration of the innocent details of an anonymous informant's tip created reasonable suspicion), *and United States v. Hernandez,* 486 F.2d 614, 616–17 & n. 2 (7th Cir.1973) (same), *with United States v. Alvarez,* 899 F.2d 833, 843–44 (9th Cir. 1990) (Reinhardt, J., dissenting), *and State v. McCormick,* No. 99–CA–5, 1999 WL 770182, at *2 (Ohio Ct.App. Aug.27, 1999) (holding that, where police can only corroborate neutral details, reasonable suspicion does not exist).

The Court need not resolve that issue, however, because the police in this case base their reasonable suspicion not only upon their corroboration of the innocent details provided by the informant. Instead, they also followed Defendant for almost three hours after corroborating those neutral details. During that time, police observed that Defendant met with someone for a few minutes in the parking lot of Chi Chi's, a place in which, so Sgt. Payer testified that his years of counter-narcotics work had led him to conclude, drug dealers often conducted transactions in illegal narcotics. Because the conduct that police observed in Chi Chi's parking lot was consistent with the behavior of a drug dealer seeking to resupply his inventory, and because police had corroborated almost all details of the informant's tip, this Court holds that police had reasonable suspicion to stop the Cadillac containing Defendant. The Court thus finds no Fourth Amendment violation in that stop.[2]

**B. Search of Vehicle and Binocular Bag**

Because Defendant has adduced no evidence that he had a subjective expectation of privacy in either the Cadillac or the binocular bag, the Court holds that Defendant has not demonstrated that he has standing to challenge the search of either of those items. *See United States v. Twilley,* 222 F.3d 1092, 1095 (9th Cir.2000).

Because the weapon underlying count I of the indictment flowed from officers' stopping and searching of the Cadillac, the Court will not order that weapon suppressed.

**C. Defendant's Alleged Consents to Enter his Home and Seize Firearms and to Search His Home for Narcotics**

Defendant obviously has standing to challenge the warrantless search of his own house. The Government contends that its warrantless search of Defendant's home was valid because of Defendant's consent. When the Government asserts that a warrantless search was valid because of consent, it bears the burden of proving the matter by a preponderance of the evidence. *United States v. Bueno,* 21 F.3d 120, 126 (6th Cir.1994). The Government must show "through clear and positive testimony that the consent to search was given voluntarily." *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir.1998) (inter-

2. Defendant also argues that the officers' alleged removal of him from the car and frisking of him also violated the Fourth Amendment. Those arguments are irrelevant for purposes of this motion because neither the officers' alleged removal of Defendant from the car, nor their frisk of Defendant, led to the sidearm or any other evidence.

nal quotation omitted). Voluntary consent must be "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Id.* (internal quotation omitted). When determining the issue of voluntariness, the Court must evaluate the totality of the circumstances. *Id.*

First, the Court must weigh several factors regarding the person who allegedly gave consent, including: his age, intelligence, and education; whether he understood that he had the right to refuse consent; and whether he understood his constitutional rights.. *Id.*

Second, the Court must consider the details of any detention preceding the alleged consent. *Id.* This examination must delve into the length and nature of the detention, any coercive or punishing police conduct, and any indications of more subtle coercion that could impair a person's judgment. *Id.*

During the hearing, the Court had the opportunity to observe that Defendant is an adult who appears to be in his twenties. Defendant appeared to be an intelligent person who could understand English. The Court also heard clear and positive police testimony to the effect that Defendant waived his *Miranda* rights and that he understood those rights. The Court credits that testimony.

Preceding his alleged consent, Defendant had been in custody no more than a few hours. There is no evidence that the police subjected Defendant to any coercive or punishing conduct.

Defendant argues that any alleged consent he may have given to seize weapons in, or search, his home was involuntary because, when Defendant allegedly consented he: (1) was in custody; (2) was not advised that he could refuse the search; (3) "was not provided a written consent form and the opportunity for reflection that such a form would allow"; and (4) "knew the agents were at his home, had used his key to open the door, and, at the time of his second 'consent,' remained in his house well after the seizure of the guns—purportedly the reason for admittance—had been accomplished." (Def.Br. at 8–9.) The Court considers these arguments in succession.

Defendant correctly argues that he was in custody when he allegedly consented. But that, simpliciter, does not show that his consent was involuntary. *United States v. Jordan,* 399 F.2d 610, 614 (2d Cir.1968) (citations omitted).

Defendant's next argument, that he was not advised that he could refuse consent to allow the officers' entry into his home, is somewhat wide of the mark. It is true that there is no evidence that police explicitly told Defendant that he need not consent to a search of his home. But Defendant does not contest Plaintiff's evidence to the effect that he was advised of his *Miranda* rights and warnings shortly before his alleged consent.

Those rights and warnings include, *inter alia,* the right to remain silent and the warning that anything a defendant says may be used against him in court. The statement to a suspect that he may remain silent and that anything he says may be used against him is tantamount to an admonition that the suspect need not submit to a search and that, if he does, anything discovered may be used against him. *See United States v. Goosbey,* 419 F.2d 818, 818–19 (6th Cir .1970) (citing *Gorman v. United States,* 380 F.2d 158 (1st Cir.1967)); *see also United States v. Pollington,* 98 F.3d 341, 343 (8th Cir.1996) (reasoning that "an officer need not inform an individual that he can refuse consent to search"). *But see United States v. Moderacki,* 280 F.Supp. 633, 636 (D.Del.1968). When the police read Defendant his *Miranda* rights,

therefore, they effectively put him on notice that he need not consent to a search of his home. The Court therefore rejects Defendant's argument to the effect that, shortly after Defendant was "Mirandized," the officers' failure to state explicitly that Defendant need not consent to a search militates toward the conclusion that Defendant's consent was involuntary.

The Court now turns to Defendant's third argument, i.e., that he "was not provided a written consent form and the opportunity for reflection that such a form would allow." The Court concludes that this assertion is factually true, but of little weight. Written consent to conduct a search is unnecessary. *Pollington,* 98 F.3d at 342–43.

Defendant's fourth assertion is that he "knew the agents were at his home, had used his key to open the door, and, at the time of his second 'consent,' remained in his house well after the seizure of the guns—purportedly the reason for admittance—had been accomplished." Defendant puts forth no authority in support of the proposition that this assertion, if true, should lead the Court to suppress the evidence found in Defendant's abode. That the agents were at his home should not have surprised Defendant: he gave them permission to enter in the first place. The police used Defendant's key to open his door, but only after he permitted them to do so.

That the police remained in the house after seizing the firearms and observing what appeared to be cocaine residue also does not aid Defendant. Defendant does not dispute the Government's evidence that police observed the cocaine residue in plain view while attempting to seize the firearms which Defendant had previously given them permission to seize. Even under a relatively restrictive view of police prerogatives, once the officers saw cocaine residue in plain view, they probably had the authority to, at a minimum, impound Defendant's house while seeking a warrant. *See Maryland v. Garrison,* 480 U.S. 79, 93 n. 3, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (Blackmun, J., dissenting). The officers more likely had authority to seize the cocaine residue itself. *See United States v. Wolfe,* 22 F.Supp.2d 627, 641–45 (E.D.Mich.1998) (Gadola, J.). It was after the officers' seizure and identification of that residue, and not the mere establishment of a police presence in Defendant's home, that Defendant consented to allow the police to make a thorough search of his home. The Court thus concludes that the officers' remaining in Defendant's home during the period between their seizure of the weapons and Defendant's granting of permission to search the house for drugs did not lead to any evidence and could not, therefore, require suppression of any evidence in this case.

Defendant also argues that his alleged consent must be suppressed because it "followed illegal police practices," to wit: the officers' allegedly improper search and seizure of the Cadillac; officers' use of Defendant's key to turn the lock on Defendant's door without "founded suspicion" justifying the intrusion; the officers' "going around to the back of [Defendant's] residence to see if the door was locked." (Def.Br. at 9–14.)

None of the alleged "illegal police practices" help Defendant's case. As discussed above, the stop of the Cadillac was permissible and Defendant lacks standing to challenge the officers' search of the auto. Where, as here, policemen use a key to turn the lock of a door as a means of identifying the owner of a property, but do not to enter through that door, there is not a search within the ambit of the Fourth Amendment and thus there is no basis of a motion to suppress. *See United States v.*

*DeBardeleben*, 740 F.2d 440, 445 (6th Cir. 1984). Defendant adduces no evidence or argument that the officers' "going around to the back of [Defendant's] residence to see if the door was locked" led to any evidence in this case. The Court will therefore not suppress evidence on that basis.

This Court holds that Defendant validly consented to the officers' search of his home and that there is no need to suppress any evidence police discovered in the house on the ground that it was the product of an improper search.

**D. Defendant's Statements to Police**

Defendant first argues that the statements he made to Sgt. Payer must be suppressed because "they resulted from the exploitation of police illegalities." (Def.Br. at 15.) As discussed above, however, Defendant has failed to establish any illegality on the part of the police. The Court therefore rejects this argument.

Defendant makes the same argument in relation to statements that Defendant made to Agent Kendall on February 15 and adds that these statements are inadmissible because they were made well after Defendant's original *Miranda* warnings.

The Government avers that Sgt. Payer reminded Defendant of his *Miranda* rights and warnings immediately before Agent Kendall questioned Defendant. There is no evidence, however, supporting that assertion. Given the lack of evidence for this argument, and considering that it does not comport with Agent Kendall's testimony (Hrg.Tr.104–05), the Court rejects it.

The question thus becomes whether the passage of time between Defendant's being provided with his *Miranda* rights on February 14 and his interview with Agent Kendall on February 15 rendered his *Miranda* warnings stale. There is no blanket rule for when police must remind a suspect of his *Miranda* rights, and the mere elapse of time does not necessarily dictate that police give fresh warnings. *See United States v. Weekley,* 130 F.3d 747, 751 (6th Cir.1997). Instead, the inquiry comes down to two questions: (1) whether, when he received his *Miranda* warnings, Defendant knew and understood his rights; and (2) whether anything happened between the warnings and Defendant's inculpatory statements, including the passage of time or any other intervening event, that rendered Defendant unable to fully consider the effect of an exercise or waiver of those rights before speaking with police. *United States v. Vasquez,* 889 F.Supp. 171, 177 (M.D.Pa. 1995).

Sgt. Payer's uncontradicted testimony was that Defendant understood his rights under *Miranda,* as evinced by Defendant's signing of the *Miranda* waiver. The Court finds this testimony credible and concludes that Defendant knew and understood his rights when he received his *Miranda* warnings.

More than eighteen hours had passed, however, between the *Miranda* warnings that Sgt. Payer gave Defendant on February 14 and Defendant's interview with Agent Kendall on February 15. During that period, there was an interruption in the continuity of the interrogation, as Sgt. Payer had ceased his questioning at 1:13 a.m. on February 15 and Agent Kendall did not begin his interview earlier than 6:00 p.m. (Hrg.Tr. at 90:8.) There was a change in location between the interview that Sgt. Payer conducted and the interrogation done by Agent Kendall. The former was at the police station; the latter was at the federal building. (Hrg.Tr.89, 105.) Agent Kendall, who conducted the interview of Defendant on February 15,

was not the same officer who administered the warnings on February 14. All of these factors militate toward the conclusion that Defendant could not fully appreciate a waiver of his *Miranda* rights when he spoke to Agent Kendall on February 15 and that his statements to Agent Kendall must therefore be suppressed. *See Commonwealth v. Dixon,* 475 Pa. 365, 380 A.2d 765, 767–69 (1977). The Court apprehends no factors militating toward the opposite conclusion.

Considering the totality of the circumstances, the Court holds that Defendant's *Miranda* warnings were stale when he spoke to Agent Kendall on February 15. The Court will order suppressed any inculpatory statements that Defendant made to Agent Kendall during their interview on February 15.

## IV. CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant's inculpatory statements that he made to Agent Kendall during the interview of February 15 are **SUPPRESSED;**

**IT IS FURTHER ORDERED** that Defendant's motion to suppress is, in all other respects, **DENIED.**

**SO ORDERED.**