Grover C. ROBINSON, Petitioner,

v.

Robert PARRATT, Warden of the Nebraska Penal and Correctional Complex, Respondent.

William E. MICEK, Petitioner,

v.

Robert PARRATT, Warden of the Nebraska Penal and Correctional Complex, Respondent.

Nos. CV75–L–86, CV75–L–87.

United States District Court, D. Nebraska.

April 26, 1976.

J. William Gallup, Omaha, Neb., for petitioners.

Terry R. Schaaf, Asst. Atty. Gen., Lincoln, Neb., for respondent.

## MEMORANDUM

URBOM, Chief Judge.

Grover C. Robinson and William E. Micek, inmates at the Nebraska Penal and Correctional Complex, have each petitioned this court for a writ of habeas corpus. As the issues raised by them are identical—although their status in relation to the issues

varies—the cases were consolidated for the purpose of oral argument and will be jointly disposed of in this opinion.

The issues raised are:

1. Whether a search for and seizure of evidence violated the petitioners' Fourth Amendment rights; and

2. Whether representation of both petitioners by one counsel when they had conflicting defenses denied them effective assistance of counsel.

## I. SEARCH AND SEIZURE

The facts relating to this issue are accurately stated by the Supreme Court of Nebraska in *State v. Micek*, 193 Neb. 379, 227 N.W.2d 409 (1975), and I adopt them for the purpose of my review here. The court stated them as follows:

"About 1:14 a. m., on the morning of February 4, 1974, deputy sheriff Wintle, who was in charge of the night shift, received a call to go to a home in Irvington, Nebraska. He arrived there about 1:17 a. m. The complainant pointed out a Dodge automobile parked just south of his home which he had never seen in the vicinity before. The car was unoccupied. On investigation the deputy sheriff determined that the grill was warm, indicating that the car had been driven recently. He checked the registration and determined that it was registered to a Shirley M. Micek, 4741 South 78th Avenue. He had recently been given the name of William Micek as a possible burglary suspect, because of his association with a William O'Kelly, a known burglar. He left the car and checked the Irvington area, but did not discover anything unusual.

"Wintle was called back to the complainant's residence about 2:05 a. m. He was given the description of a man who had been around the car which was now gone. He was told that it appeared as though the man had taken off the rear license plate. Wintle immediately called the sheriff's office and suggested that the car be stopped and a routine check be made on the occupants. Another deputy sheriff, Tramp, observed and stopped the car at 79th and L Streets in Omaha at 2:18 a. m. He notified Wintle, who immediately started for that point and arrived at 2:33 a. m.

"As Tramp was walking up to the car he observed there were three occupants and that one of them, who was in the back seat, threw his leg over a white cloth. He noticed this cloth had a red spot or stain. There appeared to be something under it, with a plastic cover. The defendant Micek, in the presence of the other two occupants, told Tramp they had been playing cards at 33rd and Burt Streets, which is 8 to 10 miles from Irvington. All three of the occupants produced driver's licenses which appeared to be in order. Tramp gave their names to the radio operator to check to see if there were any warrants outstanding on any of the individuals, and proceeded to make out field cards. He was completing the cards when Wintle arrived.

"Wintle first visited with Micek at his cruiser. Micek told him they had been playing cards at 33rd and Burt Streets, which was Robinson's home. He said he had not been at Irvington, and claimed that the car had been at 33rd and Burt Streets all night. Wintle then went to the Dodge and asked Robinson, who had gotten in behind the wheel, to step out so he could visit with him away from the others. When the door was opened he could see a parcel of meat wrapped in clear plastic. It appeared to be covered by a white cloth, or butcher's apron, with a red stain on it. Robinson's story to Wintle was the same as Micek's.

"When Wintle observed the Dodge at 79th and L Streets, it appeared to be riding lower than when he first observed it in Irvington. The license on the Dodge was the same as the one he observed at Irvington. At 2:42 a. m., he radioed back for two cars in the north area to check breakins in the Irvington area, specifically checking businesses handling large cuts of meat. At 2:44 a. m., he was advised that the Steam Shed, a restaurant in Irvington, had been broken into. He then advised the three occupants of the

car that they were under arrest. This was approximately 2:45 a. m. The occupants were searched and handcuffed. There were three cuts of meat under the cloth. When the trunk was opened it was found to be full of various cuts of meat on racks similar to racks on which it would be stored in a place of business."

193 Neb. at 381–383, 227 N.W.2d at 412.

There are several issues contained within the broader issue of whether the items seized from the Micek automobile constitutionally could be used against the petitioners at the trial.

The first is the propriety of Deputy Tramp's initial stop of the Micek vehicle. There can be no doubt that the stopping of the vehicle constituted a seizure thereof. *Carpenter v. Sigler*, 419 F.2d 169, 171 (C.A. 8th Cir. 1969); *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Such seizures can be characterized in one of three ways: arrest stops, investigative stops, or inspection stops. Note, 25 *Standard Law Review* 865, 870 (1973). No argument can be made that Deputy Tramp had probable cause to arrest the petitioners at the time he made the stop; hence, it cannot be supported as an arrest stop. Nor is this a mere driver's license and auto registration inspection stop; if it were so, the stop went far beyond its justifiable scope under *Carpenter*. Nor was it a stop for violation of a traffic regulation; the officers admit this. Thus, if it is to be constitutionally justifiable, it must be so as an investigatory stop.

The United States Supreme Court first authorized such stops in *Terry v. Ohio*, supra, saying:

". . . [A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . ."

392 U.S. at 22, 88 S.Ct. at 1880.

*Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), has expanded on this policy of allowing such stops:

". . . The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

407 U.S. at 145, 92 S.Ct. at 1923.

The standard for reviewing such a stop is stated in *Terry* at 392 U.S. 21, 88 S.Ct. 1880:

". . . [T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And simple ' "good faith on the part of the arresting officer is not enough." . . .' "

In both *Carpenter* and *Terry* the question was thus whether the seizure was reasonable under the Fourth Amendment. The court in *Carpenter* followed *Terry* in laying out a dual inquiry as to the reasonableness of this seizure. The court said at 419 F.2d 171:

". . . A reviewing court must objectively evaluate the 'specific and articulable facts which, taken together with rational inferences from those facts' and determine: (1) whether the facts warranted the intrusion on the individual's Fourth Amendment rights, and (2) whether the scope of the intrusion was reasonably related 'to the circumstances which justified the interference in the first place.' "

What "specific and articulable facts" and rational inferences therefrom did Deputy Tramp and his office have at the time he made the stop? They knew or had reason to believe that:

1. The car had been reported at about 1:14 a. m. by Philip Taylor as being parked in front of his home in Irvington, Nebraska, where he had never seen it before, and upon investigation by Deputy Sheriff Wintle at that time the grill was found to be warm and the car registered to Shirley Micek, 4741 South 78th Avenue, Omaha;

2. Shirley Micek's husband, William Micek, had been associating with a known burglar, William O'Kelly;

3. Burglaries in the county had recently been rising;

4. At some time between 1:14 a. m. and 2:05 a. m. Philip Taylor had seen a man at the car appear to remove the rear license plate and then drive the car away.

These were circumstances sufficiently suspicious to warrant further investigation by stopping the car, as was true in *Orricer v. Erickson*, 471 F.2d 1204 (C.A. 8th Cir. 1973); *United States v. Wickizer*, 465 F.2d 1154 (C.A. 8th Cir. 1972); *Fields v. Swenson*, 459 F.2d 1064 (C.A. 8th Cir. 1972); and *United States v. Baker*, 377 F.Supp. 102 (U.S.D.C.S. D.1974).

The next issue is whether the scope of the intrusion was reasonably related to the circumstances which justified the interference in the first place. In *Wickizer*, supra, the court said that if the officer had a justifiable basis for the initial intrusion, "he may take whatever additional action which would 'warrant a man of reasonable caution' under the circumstances to take." 465 F.2d at 1156. There, the frightened expression of the two young girls in the back seat of a car found in a high rape area justified the initial intrusion; even though the initial questioning gave an appearance that all was well, the officer was justified in going further to dispel his suspicions. This he did by conducting a flashlight inspection of the back seat from outside the car.

The petitioners cite *United States v. Cupps*, 503 F.2d 277 (C.A. 6th Cir. 1974), as supportive of the proposition that ordering the suspect out of the car exceeds the permissible scope of a *Terry* stop. In that case, however, the officers had no reasonable suspicion of any criminal involvement. They knew only that the suspect had a previous criminal record. The stop was justifiable only as a driver's license and auto registration inspection stop. The level of known facts and reasonable inferences therefrom is considerably higher here.

Furthermore, the Eighth Circuit held in *Carpenter*, supra, that it was proper to ask the driver to get out of the car rather than merely hand identification through the window. There, suspicion existed that the suspect might have a weapon and this justified the officer's request. In *United States v. Harflinger*, 436 F.2d 928 (C.A. 8th Cir. 1970), the court also approved an officer's demand that the driver get out of the car to answer questions. There it was permissible so the officer could better judge the driver's demeanor in answering questions and so the officer could protect himself from any hidden weapons.

■ The question of the permissible scope of an investigatory stop is not one which can be answered by any set of fixed rules. Rather, the inquiry is always as to the reasonableness of the officer's actions based on the facts and reasonable inferences therefrom that he has at the moment he takes the action. Each case must turn on its facts. As new information becomes available to the officer, the basis for his suspicion changes. In some cases continued detention and questioning may be nothing more than fishing expeditions and hence constitutionally impermissible. In others, the initial suspicion may give rise to others and demand that a good police officer investigate further.

When Tramp first approached the car, he noticed the petitioner Robinson, the sole occupant of the back seat, appear to move his leg over a white sheet with a red, quarter-sized spot on it. He testified that as an officer approaching a car containing three suspects, he was trained to notice such movements for his own protection. The significance of this movement in providing further suspicion is confirmed by *Wilson v. Porter*, 361 F.2d 412 (C.A. 9th Cir. 1966), recently cited with approval in *United States v. Geelan*, 509 F.2d 737 (C.A. 8th Cir. 1974). In *Wilson*, the officer noticed a passenger in a stopped car slide down in his seat as if to place something under the seat or on the floor, and the officer was thus justified in shining his flashlight there.

Here, at the moment of the stop, Deputy Tramp had sufficient suspicion to check the occupants' driver's licenses, ask where they had been, make out field cards, and run a warrant check on them. (Field cards apparently are 3 × 5-inch index cards on which the officer records physical data about the suspects and the time and location. This serves as a potential tie-in to a witness' description of the suspect on that evening.) The suspicions the sheriff's department had about the occupants of the Micek vehicle justified such field cards. Deputy Tramp did not go beyond this limited intrusion. Admittedly, fifteen minutes is a lengthy detention; yet by the time Deputy Tramp secured the necessary information, there was probably only a lapse of a few minutes from the time he sent in the warrant check. He could properly wait a few minutes for a response before allowing the suspects to leave.

Officer Wintle arrived fifteen minutes after the initial stop. He knew that Micek was lying about the presence of his car in Irvington. This lie was significant, because it went to the very nature of the suspicious circumstances which led to the stop in the first place. Officer Wintle was then justified in pursuing his investigation further. He testified that he was not going to let the suspects go until he had either confirmed or dispelled his suspicions about them. He questioned them further and then asked Robinson to get out of the car. It was then that he saw the meat wrapped in plastic. The meat was in plain view when the car door opened. More suspicion thereby existed that some criminal activity was afoot. Still, however, no probable cause to arrest existed. The radio report that the Steam Shed had been broken into was the key to providing probable cause to arrest and came only three minutes after the meat was discovered. The Steam Shed is located just a short distance from where the Micek automobile had been parked in Irvington. Obviously, the three suspects could not have been detained indefinitely while other officers searched for break-ins. The short time span here negates any such challenge on this ground, however.

Thus, the scope of the intrusion was "reasonably related to the circumstances which justified the interference in the first place." The officers had probable cause to arrest the suspects after the discovery of the Steam Shed break-in, coupled with the awareness that the car appeared to be riding lower when seen at the scene of arrest than when it was in Irvington a short distance from the scene of the break-in at the Steam Shed. The officers then searched the back seat and trunk of the car and discovered the rest of the stolen meat. This search can be justified both as a search incident to an arrest and as one based on probable cause under the automobile exception of *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *United States v. Harflinger,* 436 F.2d 928, 935 (C.A. 8th Cir. 1970), has held that the permissible scope of a warrantless search incident to a lawful arrest includes the search of the trunk of the vehicle. This holding has been followed in *United States v. Heisman,* 503 F.2d 1284, 1290 (C.A. 8th Cir. 1974), and is sufficient to justify the search here. In addition, however, it can be justified under the *Carroll* exception.

The United States Supreme Court has long recognized a distinction between a search of an office or home and that of an automobile, because "the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). While not every search of an automobile will fall within the scope of the *Carroll* exception, *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the facts here justify application of that rule. *Chambers v. Maroney,* 399 U.S. 42, 49, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970), cites language from *Carroll* as the appropriate statement of the test used in the "moving vehicles" exception to the general "warrant" rule:

> "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer

has for belief that the contents of the automobile offend against the law."

See also *Chimel v. California,* 395 U.S. 752, 764, n. 9, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ In addition to the four factual items which served to justify the initial stop, supra, the following items existed to constitute probable cause:

1. Prior to the search, meat suspected as being stolen had been observed in plain view on the floor of the car;

2. The petitioners had been arrested for the break-in at the Steam Shed Restaurant in Irvington, Nebraska;

3. The residence outside which the car had been previously observed was only a short distance from the Steam Shed;

4. The car now appeared to ride lower than it had when observed by the same officer in Irvington.

On this basis, the officers did possess probable cause to search the back seat and trunk of the automobile for goods stolen from the Steam Shed Restaurant.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

■ Both petitioners next urge that the trial court's action, just before trial was scheduled to begin, of refusing to grant a severance as between them operated to deny them effective assistance of counsel. They allege that William Gallup, their attorney, was forced to represent both of them in the same proceeding when he had a conflict of interest in doing so.[1] The petitioners were tried with a third defendant, William O'Kelly, who was represented by separate counsel.

The guiding case is *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In *Glasser,* an attorney represented two of the four defendants at a conspiracy trial. The court noted the high

potential for conflict of interest at such a trial and pointed to the attorney's failure to cross-examine one of the key witnesses and his failure to make certain evidentiary objections as indicative of the conflict of interest. The court said:

"... the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired."

315 U.S. at 70, 62 S.Ct. at 465.

The record indicates that an actual conflict between the interests of Robinson and Micek developed after selection of a jury for trial of all three defendants, Robinson, Micek and O'Kelly. Jury selection was on Friday, April 19, 1974 (plaintiff's Exhibit 1, 18:3). On the following Monday morning, April 22, Gallup reported to the court a conflict of positions between Robinson and Micek and moved for a severance, obtaining from Micek a waiver of his right to claim double jeopardy.

The conflict of positions was stated by Gallup and supported by Micek's testimony in support of the motion for severance: Both Micek and Robinson had had alibis before Friday, but on Friday afternoon the woman whom Micek expected to testify to his being at a place other than where the burglary occurred had decided not to testify, perhaps because she had to be hospitalized beginning Sunday for surgery or because she was not certain of the date of her being with Micek; Robinson's alibi remained and with the dissolving of Micek's alibi, Robinson wanted Gallup to argue to the jury that Micek was the burglar and that Robinson was just an innocent passenger in the car (plaintiff's Exhibit 1, 2:17; 4:8–16:11). Gallup told the trial court that

---

1. I do not know whether Gallup was appointed or privately retained. That does not matter, because the Sixth Amendment protection is the same either way. *United States v. Valenzuela,*

521 F.2d 414 (C.A. 8th Cir. 1975); *Larry Buffalo Chief v. State of South Dakota,* 425 F.2d 271 (C.A. 8th Cir. 1970).

he could not make that argument because he also represented Micek and thus could not fairly represent either of them in a joint trial (plaintiff's Exhibit 1, 14:16–15:13; 16:5–11). The same motion was made by Gallup at the close of the state's case for the same reason (plaintiff's Exhibit 1, 325:12).

At the trial O'Kelly offered the testimony of Linda Barkdoll and her husband, Gale Barkdoll, to the effect that O'Kelly had been continuously with one or both of them at their home from about 9:00 p. m. on February 3 until nearly 1:00 a. m. February 4 doing car repairs and that the three then went to the Skelly truck stop and restaurant at 90th and L in Omaha, arriving about 1:00 a. m., where they saw Robinson and joined him for breakfast. The testimony was that when they were finished they saw Micek's car in the restaurant's parking lot at about 2:00 a. m. and that O'Kelly and Robinson got into Micek's car for a ride home. Susan Stewart also testified that at about 1:00 a. m. she saw O'Kelly come into the restaurant with a couple whom she did not know and join at a table a man whom she identified as Robinson.

Such testimony, coupled with the state's evidence which distinguished only one set of footprints in the snow near the car when it was parked in the vicinity of the Steam Shed, was supportive of an inference that Robinson did not enter Micek's car until after the car had been parked in Irvington and the burglary had occurred and a few minutes before the car was stopped by Officer Tramp and its occupants arrested. The difficulty lies in the fact that Robinson's counsel was foreclosed from arguing the full meaning of that inference. The fully developed inference was that Micek had completed the burglary before he picked up Robinson and O'Kelly a few minutes before being found with a carload of stolen meat. That kind of inference gives to Robinson and O'Kelly an explanation for their being in a car containing stolen meat without the pressure of trying to explain how the meat got there. Gallup could not point to Micek's guilt to shield Robinson, because he

represented Micek. The conflict was thus real.

In denying the motion for a severance the trial judge was concerned, justifiably, about proliferation of trials and possible lack of diligence by Micek or his counsel in the taking of the deposition of Micek's alibi witness. Nonetheless, those concerns cannot dominate a decision about a joint trial where a conflict of interest on counsel's part is genuine, as it was here.

It appears from *Glasser v. United States,* supra, that actual prejudice need not be shown when an actual conflict develops which affects the counsel's freedom to maneuver. The court there said:

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. . . ." 315 U.S. at 75–76, 62 S.Ct. at 467.

The court in *Sawyer v. Brough,* 358 F.2d 70, 73 (C.A. 4th Cir. 1966), explained its view this way:

"The salient fact remains that divergent interests did exist, and therefore an opportunity was presented for the impairment of Sawyer's right to the unfettered assistance of counsel. It is not necessary that Sawyer delineate the precise manner in which he has been harmed by the conflict of interest; the possibility of harm is sufficient to render his conviction invalid."

Similarly, the court in *Austin v. Erickson,* 477 F.2d 620, 625 (C.A. 8th Cir. 1973), in ordering the granting of a writ of habeas corpus, said:

"Once the actual conflict had been established which affected her own right to counsel's effective assistance, Austin had met her burden."

The court in *Austin* also said:

"No attorney should be placed in a position of divided loyalty 'where he may be

required to choose between conflicting duties or to be led to an attempt to reconcile conflicting interests rather than to enforce, to their full extent, the rights of the party whom he should alone represent.' . . ."

477 F.2d at 625.

Nothing in the record suggests that Gallup violated his ethical duty to Micek by pointing to him as the sole burglar; it must be assumed that he did not, even though the closing arguments are not reflected in the record.

My conclusion is that Gallup's representation of Robinson was affected by the obvious conflict. That requires a new trial at which the representation can be unfettered.

■ The position of Micek is not on the same plane as that of Robinson. For Micek to secure a writ of habeas corpus, he must establish either:

(1) that the denial of Robinson's constitutional right to the effective assistance of counsel prejudiced him in some manner, *Glasser,* supra, 315 U.S. at 76–77, 62 S.Ct. 457, or

(2) that he, too, has been denied the effective assistance of counsel because of a conflict of interest, *Austin,* supra, 477 F.2d at 625.

■ I cannot see that Micek was in any way prejudiced by the denial of effective assistance of counsel to Robinson. The basis of my finding that Gallup's representation of Robinson was affected was Gallup's conflict of interest which prevented him from accusing Micek. That did not prejudice Micek nor did it have any possibility of doing so.

Nor has Micek been denied the effective assistance of counsel. If Gallup had attempted to place the blame for the crime on Micek, then surely Micek would have lacked the effective assistance of counsel. But this Gallup did not do. While it is true that Micek need not have suffered prejudice to be entitled to relief, it is a prerequisite to relief that the ability of his counsel to defend him be affected. The freedom of Gallup to maneuver was restricted as to Robin-

son, but not as to Micek. He could roam over the full arena of possible arguments and make his choice. Such a rationale for different treatment was recognized in *Glasser,* when the court ordered a new trial as to Glasser but not as to his codefendants.

■ But what of the fact that O'Kelly's counsel was free to make the attack that Micek was the sole perpetrator of the crime, yet O'Kelly was found guilty? May it be said that any effect of the restraint on Gallup as Robinson's counsel was harmless beyond a reasonable doubt and therefore of no cognizable importance?

Consideration of cases dealing squarely with the applicability of the harmless error doctrine of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), leads me to conclude that the doctrine is of no help to the state with respect to Robinson.

*Chapman v. California,* supra, first held that some matters of constitutional error could be deemed harmless and thus not require reversal. In so holding, the court also said:

". . . Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error [in support of this proposition the court cites in footnote 8, among others, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel)], this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. . . ."

386 U.S. at 23, 87 S.Ct. at 827.

More to the point is Justice Stewart's concurrence:

"When a defendant has been denied counsel at trial, we have refused to consider claims that this constitutional error might have been harmless. 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its deni-

al.' *Glasser v. United States,* 315 U.S. 60, 76 [62 S.Ct. 457, 467, 86 L.Ed. 680]. That, indeed, was the whole point of *Gideon v. Wainwright,* 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799], overruling *Betts v. Brady,* 316 U.S. 455 [62 S.Ct. 1252, 86 L.Ed. 1595]. Even before trial, when counsel has not been provided at a critical stage, 'we do not stop to determine whether prejudice resulted.' *Hamilton v. Alabama,* 368 U.S. 52, 55 [82 S.Ct. 157, 159, 7 L.Ed.2d 114]; *White v. Maryland,* 373 U.S. 59, 60 [83 S.Ct. 1050, 10 L.Ed.2d 193]."

386 U.S. at 43, 87 S.Ct. at 837.

*Glasser,* as earlier noted, is the seminal case in the area of representation of joint defendants by a single attorney. *Harrington v. California,* supra, modified *Chapman* on some points, but made clear that there are still those cases which require automatic reversal. The court said:

"We held in *Chapman .v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' *Id.,* at 24 [87 S.Ct. 824, at 828]. We said that, although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' (*id.,* at 23 [87 S.Ct. 824]), not all 'trial errors which violate the Constitution automatically call for reversal.' *Ibid.*"

395 U.S. at 251–252, 89 S.Ct. at 1727.

A subsequent case, *Foxworth v. Wainwright,* 516 F.2d 1072 (C.A. 5th Cir. 1975), is in point. There, four teenage inmates had been charged with the murder of a cellmate; the only witnesses were the four other cellmates. The petitioner and two of the other boys were represented by the same court-appointed attorney. The fourth boy had retained private counsel. The court held that an actual conflict existed in that the petitioner could not accuse one of the other older boys as being the sole perpetrator. The court noted that the conflict was not so much in the defense actually presented as in the "availability of a plausi-

ble defense or strategy that separately appointed counsel would have had an opportunity to exploit." The petitioner need not show that his defense would have been successful. The court said:

". . . [I]f the record shows that a plausible defense (one that might have influenced twelve reasonable jurors) was foreclosed because it might have prejudiced the other defendants represented by the same appointed counsel, the conviction must be overturned." 516 F.2d at 1079

Footnote 7 of the opinion specifically holds that the harmless error rule does not apply to such cases, citing, among others, the Eighth Circuit case of *Austin v. Erickson,* supra.

Also of particular note is the opinion's reference to the fourth defendant, who had privately retained counsel, as did O'Kelly in this case. The second to last paragraph of the opinion indicates the extent to which the fourth defendant pursued the same defense as the court had held the petitioner was foreclosed from presenting. The court seems to indicate that the fact that the fourth defendant did attempt such a defense is relevant and goes more to the point that this is a plausible defense rather than that it might be harmless error.

In "Harmless Constitutional Error: A Reappraisal," 83 Harvard L.Rev. 814, 821 (1970), the author discusses the type of case for which an automatic reversal is still appropriate. The author concludes that errors "which concern the basic 'trial machinery'— the mechanism for assembling evidence and the mechanism by which it is assessed— should call for automatic reversal." Denial of counsel is such an error, because it is a defect in the mechanism for bringing evidence before the jury.

The considerations regarding harmless error are really the same as those regarding whether prejudice has to be shown. If no prejudice needs to be shown, as in conflict cases, the error cannot be considered harmless.

Accordingly, an order must be entered provisionally granting the petition as to

Grover C. Robinson and denying it as to William E. Micek.